IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____
                               )
UNITED STATES OF AMERICA       )
                               )
     v.                        )  Case No. 8:22-cr-00380-LKG-1
                               )
JASON MICHAEL LEIDEL,          )
                               )
               Defendant.      )
_____)

                                  Greenbelt, Maryland
                                  August 20, 2024
                                  10:08 a.m.


                CONTINUED DETENTION HEARING
          BEFORE THE HONORABLE LYDIA KAY GRIGGSBY
                United States District Judge


                   A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

     OFFICE OF THE UNITED STATES ATTORNEY
     36 S. Charles Street, 4th Floor
     Baltimore, Maryland  21201
     BY:  P. MICHAEL CUNNINGHAM, ASSISTANT U.S. ATTORNEY
          (410) 209-4884
          michael.cunningham@usdoj.gov

     OFFICE OF THE UNITED STATES ATTORNEY
     6500 Cherrywood Lane, Suite 200
     Greenbelt, Maryland  20770
     BY:  THOMAS M. SULLIVAN, ASSISTANT U.S. ATTORNEY
          (301) 344-0173
          thomas.sullivan@usdoj.gov

                      (Continued)


                   Patricia Klepp, RMR
              Federal Official Court Reporter
              6500 Cherrywood Lane, Suite 200
                 Greenbelt, Maryland  20770

        Produced by Stenographic Computer-Aided Transcription

A P P E A R A N C E S (Cont'd)

ON BEHALF OF THE DEFENDANT:

    LAW OFFICE OF MARC G. HALL
    6411 Ivy Lane, Suite 304
    Greenbelt, MD  20770
    BY:  MARC GREGORY HALL, ESQUIRE
       (240) 205-3041
      mghlaw@mac.com

ALSO PRESENT:

    JASON MICHAEL LEIDEL
    USPO CELINE FERGUSON

INDEX

August 30, 2024

USA v. JASON MICHAEL LEIDEL

                                                        PAGE
WITNESSES FOR THE DEFENSE:

HERMAN E. LEIDEL, JR.
        Witness sworn ...................................... 36
        Direct Examination by Defense (Mr. Hall) ............ 36
        Cross-Examination by the Government (Mr. Sullivan) ... 42
        Redirect Examination by Defense (Mr. Hall) .......... 53
        Witness Excused .................................... 54

CHARLENE LEIDEL
        Witness sworn ...................................... 55
        Direct Examination by Defense (Mr. Hall) ............ 55
        Cross-Examination by the Government (Mr. Cunningham) . 58
        Witness Excused .................................... 65

WITNESS FOR THE GOVERNMENT:

AMOS TANG
        Witness sworn ...................................... 68
        Direct Examination by the Government (Mr. Cunningham). 69
        Cross-Examination by Defense (Mr. Hall) ............. 78
        Redirect Examination by the Government (Mr. Cunningham) 86
        Witness Excused .................................... 87

P R O C E E D I N G S

(Call to order of the Court.)

THE COURTROOM DEPUTY:  Please rise.  The United States District Court for the District of Maryland is now in session, the Honorable Lydia Kay Griggsby presiding.

THE COURT:  Good morning, everyone.

(All responding:  Good morning, Your Honor.)

THE COURT:  If you could be seated for a just a moment, I'll just briefly go over the masking policy before the government calls the case, just so we all know -- so you can take a seat for just a brief moment -- for the benefit of those who may be joining us today for the first time.

For Counsel, Mr. Leidel, if you're fully vaccinated and comfortable, you can remove your mask during today's proceedings.  As we have witnesses who come forward to testify, if they meet that criteria, they can also lower their mask when they provide their testimony.  The Court's in that category, so I'm going to remove my mask so hopefully, you can hear me a little bit better.

With that, good morning, and I'll invite the United States to please call the case.

MR. CUNNINGHAM:  Good morning, Judge Griggsby.  We call the case of the United States v. Jason Leidel, Criminal Docket No. LKG-22-0380.

Michael Cunningham and Thomas Sullivan for the

United States.

THE COURT:  Good morning, Counsel, welcome.

MR. SULLIVAN:  Good morning, Your Honor.

THE COURT:  Counsel for Mr. Leidel.

MR. HALL:  Yes.  Good morning, Your Honor.

Mark Hall representing Mr. Leidel, who is present to my right.

THE COURT:  Good morning, Mr. Hall.

Mr. Leidel, good morning, and welcome back.

Well, I just want to take a few brief moments to walk through what brings us here today for the record.  As counsel is aware, we're here today on a hearing which relates to Mr. Leidel's detention and whether the Court should revoke that detention.

Going back to October 20th of 2022, at that time, a sealed complaint was filed against Mr. Leidel, after which he made an initial appearance with the Court, and he was ordered temporarily detained at that time back in 2022.  Thereafter, the Court held a detention hearing and issued an order of detention that found by clear and convincing evidence that no condition or combination thereof could reasonably ensure the safety of others, and the community, and Mr. Leidel's continued presence in this matter.  On November 3rd of 2022, an indictment was issued against Mr. Leidel, and that charged him with stalking, in violation of Title 18, United States Code, Section 2261.

Mr. Leidel was subsequently arraigned on that charge on January 3rd of 2023.  At that time, he pled not guilty, and at that time, the Court also issued an order setting conditions of his release pending trial.  Those conditions included that Mr. Leidel shall be placed in the custody of his parents, that he shall report on a regular basis to his supervising Pretrial Service officer, he should avoid all contact with his codefendant in this case and an individual named William Corby.

On January 9th of 2023, the Court held a detention hearing with regards to Mr. Leidel and ordered Mr. Leidel released subject to the conditions I have just described.

On December 4th of 2023, the government filed a motion to revoke Mr. Leidel's pretrial release, and the government maintains that Mr. Leidel has violated the conditions of his release by attempting to obstruct a criminal investigation, in violation of 18 U.S.C., Section 1510, tampering with a witness, victim, or informant, in violation of 18 U.S.C., Section 1512, retaliating against law enforcement, in violation of Title 18, U.S. Code, Section 1521, and his continued use of the internet and interstate communication services.

On December 5th of 2023, the Court issued an order revoking Mr. Leidel's conditions of release and granting the government's request to issue an arrest warrant for Mr. Leidel. Thereafter, the Court entered an order of detention by agreement.

And then, on January 17th of 2024, the Court held another detention hearing concerning Mr. Leidel. During that hearing, the Court determined that there was probable cause to believe that Mr. Leidel had committed certain federal crimes while on his release pending trial, including obstruction of justice and witness tampering. The Court also found that there was clear and convincing evidence that Mr. Leidel had violated the condition of his release by using internet-capable devices, and the Court concluded there were no conditions or combinations thereof that could be established to reasonably ensure the safety of the community and continued presence in connection with this matter, and so Mr. Leidel was ordered detained by the Court at that time.

On July 12th of 2024, Mr. Leidel and his counsel filed a motion for review of the Court's detention order. The government subsequently filed a response in opposition to that motion on July 22nd, and the government filed a supplemental response on August 6th of 2024.

The Court initially held a hearing on August 8th, 2024, and before we got into the substance of that hearing, the

Court did raise some preliminary concerns about how we should proceed.  The United States has since consulted and provided the status report with the Court, stating that there is no concern about a conflict of interest in this case and present counsel continuing to represent the government in this matter.  The Court understands the defense has no objection to counsel continuing to represent the United States in this matter, and so today, we return to complete our work in connection with the hearing and for the Court to resolve the motion to vacate at the conclusion of today's proceedings.

A few preliminary matters.  I just want to make sure I understand where we are, Counsel.  The Court understands that we will have witness testimony today, potentially from both sides, and each side has indicated they need about an hour to present their part of the case.

Is that still the case with regards to the government, about an hour?

MR. CUNNINGHAM:  Judge, I don't think that it would take that long.  Candidly, we would proffer the information that's contained in affidavits in support of the government's contention that continued detention is appropriate in this case. I don't think a witness is necessary, but should that arise, it certainly wouldn't take us more than an hour to present the information.

THE COURT:  So you don't intend on calling any

witnesses at this time.

MR. CUNNINGHAM:  No, Your Honor.

THE COURT:  Okay, that's helpful to know.

And similarly, for the defense, do you have any witnesses you're going to call today?

MR. HALL:  Yes, Your Honor.  Both of my client's parents are present; they're in the defense waiting room in case there was a request for a rule on witnesses.  And I don't believe their testimony would be long, but we are certainly prepared to present that.

THE COURT:  And those would be the only two witnesses for the defense?

MR. HALL:  Those would be the only two, yes.

THE COURT:  Okay.

All right.  Well, just some rules of the road.  To the extent that there are exhibits -- and I understand that there are at least a couple from the defendant -- we'll follow the Court's local rule, and unless there's objection when they're called up by counsel, they'll be deemed admitted for purposes of today's proceeding.

In terms of witnesses, is there an objection to the parents being in the courtroom during the entirety of the proceeding?

MR. CUNNINGHAM:  Just the one before the testimony of the other; I wouldn't want them in -- the other parent in while

the one's testifying, Your Honor.

THE COURT:  Okay.  So do you have an objection to them coming in now, or you're saying they should be out for the entirety of the proceeding?

MR. CUNNINGHAM:  I don't have an objection to them -- well, actually, Judge, I do; I'd prefer that they just wait outside.  What I meant was, if, for example, Mr. Leidel testifies first, I don't have an objection to him staying during the testimony and --

THE COURT:  Once he's testified.

MR. CUNNINGHAM:  Correct.

THE COURT:  Okay, understood, all right.

MR. CUNNINGHAM:  Thank you.

MR. HALL:  That's fine, and --

THE COURT:  Counsel, any concerns about that?

MR. HALL:  No, Your Honor.  The only thing I was going to just tell the Court, I did neglect to give either of them masks to wear when they come in the door.  I can step back and do that.

THE COURT:  Okay.  Well, our court security officer will have masks to give them when they come in.

MR. HALL:  Okay, all right.  Thank you, Your Honor.

THE COURT:  And again, if they meet the Court's criteria when they testify, they can lower their mask.

MR. HALL:  Yes.

Just wanted to make sure.

THE COURT:  Okay.  Thank you, Counsel, that's helpful.

Anything else we need to talk about before we proceed?

MR. CUNNINGHAM:  No, Your Honor.

THE COURT:  All right.  I assume -- does the government wish to present first?

MR. CUNNINGHAM:  Judge, I'll be, hopefully, very brief.  Obviously, the government has not changed its position in this case.

As you went through the process, you indicated that in January of 2024, Magistrate Judge Sullivan held a hearing during which he went through the 3142 analysis and factors and concluded that there was clear and convincing evidence to show that detention was appropriate in this case.  The basis for that was largely the affidavit that had been submitted in support of the government's motion to revoke his prior pretrial release as well as obtain an arrest warrant for that purpose and his initial appearance on that, at which time there was a very brief conversation, but I believe there was detention by consent at that point pending the subsequent review.

In that respect, Your Honor, just to add to what you had gone through, I think it's appropriate to note that when Judge Xinis heard the -- she held a hearing in -- that was January of 2023.  She had obviously carefully read the 80-plus page affidavit that had been submitted in support of the

criminal complaint.

Much of that information was largely communicated then to the grand jury that returned the indictment charging him with the stalking count of 31- -- or excuse me, 2161(a) [sic] and certainly appreciated -- and I should emphasize that the victim, putative victim, except, obviously, the burdens and such, but in any event, E.S., the ex-wife of the defendant, was not present during the presentation before Judge Xinis, but she had been present during the presentation before Judge Copperthite and had essentially articulated the concerns she had, the -- you know, the experience she had as the person suffering most from the conduct that was charged.

And Judge Xinis appreciated that this was a serious charge, that the evidence was substantial in support of the government's charge of the defendant, and that because it was perpetrated primarily across the internet, and the ubiquity of the internet and access to it, that it was imperative that the defendant be precluded, essentially virtually precluded from any internet connectivity.  And that was, as you indicated, the bulk of what her release order contemplated, including requiring the parents to file affidavits, which I do believe that those are going to be presented to the Court as evidence from the defendant.

I don't know whether it was a matter of protocol.  I know they were ordered.  We had not previously seen them.  Maybe

they were submitted under seal in some way.  But they're certainly consistent with what the expectations were after Judge Xinis' release order was executed.

So the defendant was, in fact, released in -- I think it was -- I think the exact day was January 9th of 2023 -- and shortly thereafter went to his parents' residence.  It was thereafter that the succession of events began to occur as reflected in Agent Tang's affidavit.

And I apologize if I -- I may get one or two of them out of the order here, but essentially, what we had was, initially, there was a -- there was a complaint, or there was some communication in mid-January, respecting like a FOIA request.  And as we had previously said, in every occasion where something happened that was attributed to another individual, one of the first things the agents did was to reach out to that person to determine, hey, is this a product of your creation, did you send this email, is this a concern you have.

Now, I accept the fact that, you know, simply saying or simply presenting to you that a witness denied doing something doesn't carry -- you know, carry it across the line, but obviously, the agents -- that was a preliminary step in determining, was this a legitimate communication, and there was a FOIA request that purported to be submitted from E.S. that, on its face, one, didn't make sense, and two, the agents ascertained that in fact it wasn't from her.

And then, even before they could get into sort of the nitty-gritty and drilling down and trying to figure out what was, in fact, the source of this, there was the -- I want to say January 31st incident -- January 31st of 2023, in which the FBI's essentially complaint hotline received a rather lengthy email exchange.  This was the subject about which you had talked when we last had -- because it made reference to me by name as well as Special Agent Kuo, who at one point in time -- and just for your own edification, Your Honor, Special Agent Kuo is, in fact, in the courtroom.  I don't expect that he's testifying. But it referenced both of -- both Special Agent Kuo and myself as having engaged in, essentially, misconduct.

And the purported sender of that was an individual named Peter Imbrogno, I-M-B-R-O-G-N-O.  Mr. Imbrogno was known to us as the guardian ad litem for the dependent children of the defendant and E.S.  As is pretty clear from both affidavits -- I stand corrected -- at least the first affidavit, Special Agent Kuo's affidavit, these two were engaged in rather contentious, protracted domestic relations disputes, including issues of child custody and support, which apparently were fairly contentious, or at least contentious enough that the Court had appointed a guardian ad litem.

The Court had also identified -- and just to go back, had also identified a psychologist who was supposed to assist the Court in assessing the suitability of both individuals for

custodial responsibilities, and that's important because as you recall from the underlying allegations, the defendant submitted to her, the psychologist, a document that was patently false; it purported to be a part of the medical record of E.S. that indicated she had been a recipient of mental health treatment while they were assigned -- while he was assigned and she was accompanying him during his Air Force assignment at Wright-Patterson Air Force Base in Ohio.

Agents investigated that and proved it to be completely false.  Neither of the physicians had documented it, she hadn't been the person to receive that.  It made allegations in there of drug abuse and such, clearly intending to fraudulently interfere with the process that the domestic relations proceedings in Virginia were trying to undertake.

But I have digressed, so let me get back to the more significant aspects of the allegations respecting violations in this case.

Subsequent to -- you know, speaking to Mr. Imbrogno, who obviously is an attorney -- I shouldn't say obviously; he is an attorney.  But if you just read, as included in the affidavit, the text of that communication, it was -- not only was it sort of rife with error and inaccuracies and such, but it's certainly not written as you would expect a document to have been written by a professional who actually thought there was a legitimate complaint to be made.

I would also note as something of an aside that the parties have been in communication with Mr. Imbrogno solely for the purpose of advising him of what the proceedings were, what was going on, not -- we weren't sharing information or anything of that nature.  He certainly knew how he could have reached out if he had some concerns about the nature of information that was disclosed and what have you.

The communication also includes sort of an -- a side reference as if he was trying to defend the defendant in this case by, you know, a comment regarding the -- you know, this decorated veteran.  So this precipitated an effort to drill down as well as possible and figure out where are these communications coming from.

Subsequently, there were communications or attempted communications to Sarah Sorg, who was the former partner of the defendant.  That was communicated to the government through her attorney.

And finally, there was the email that purported to have come from E.S. to me that I, in fact, referred back to the agents, and the substance of this email, as reflected, again, in the affidavit, would have clearly undermined the credibility of E.S. as a complaining witness/victim should this case go to trial.

It was intended to show -- in fact, she said, Thanks for standing by me even though I'm lying, I appreciate it,

anything you can do to help me.  Well, I would represent to the Court that one thing the government has done, and, you know, we encouraged -- told the agents flat out, assiduously avoid anything that appears to or actually does seem to try to put our thumb on or -- the scales involving --

(Court reporter requesting clarification.)

MR. CUNNINGHAM:  I said, the government advised the agents, in the course of the investigation, to assiduously avoid anything that actually or even appeared to be putting our thumb on the scales of the domestic relations proceedings.  That's not our business, I haven't -- you know, it's not something for which we're responsible, and we'd be irresponsible in even trying to, you know, get involved in that.

In fact, on that point, Judge, I would note that notwithstanding the very strict restrictions on Mr. Leidel's liberty after Judge Xinis authorized his release, specifically -- essentially, 24/7 lockdown, the government, I think at every request, consented to his -- to the exception to those restrictions for him to travel as necessary for court proceedings in Virginia.  So we didn't try to impede his ability to proceed with those matters.

I -- I'm not sure what the status is now, obviously, since he's not been able to travel since he was -- since his liberty was revoked or his release had been revoked, but in any event, prior to that, we had certainly acquiesced,

notwithstanding these earlier indications that suggested that, you know, he was engaged in obstructive behavior.

So I've told you what we saw happening that we thought was obstructive.  The agents then in turn tried to essentially pin this down to where was it coming from, and -- excuse me Your Honor -- as laid out in Agent Tang's affidavit, you know, we went to Apple, we went to a number of sources to try to figure out, where's this communication originating, and for all intents and purposes, if I can summarize, it resolved back to a telephone that was -- that belonged to Herman Leidel.

And what the access through Apple showed was that after the defendant's release from custody in January of 2023, Herman Leidel accessed and apparently put on his phone a number of applications, things like VPN, Pinger, Pinger Text Now, Proton Mail, some of -- some, if not all, of which were consistent with applications that we saw -- and DuckDuckGo was another one of them, but all of which we saw having been used in the underlying crime of stalking of E.S., as well as how it impacted other people, the way emails were spoofed, the way they were sent to both E.S. and other individuals.

All of this was consistent.  It was accessed on Herman Leidel's phone after the defendant's release.  Now, we're not, at this point in time, in a position to tell you that we know whose fingers were on a phone at a specific time, but certainly, the evidence was sufficient to convince

Judge Sullivan that there was probable cause here to believe that he was violating the terms of his release and sufficient to revoke it.

I should also add that most of those things happened in the front end of the defendant's release, shortly within the few months after his release in January of 2023. It took a while for the agents to get the information from different sources in order to be able to essentially attribute this conduct back to the defendant.

And -- but in the meantime -- and one of the incidents that was more specifically in violation of Judge Xinis' very strict release conditions was, in October of 2023, the government had agreed to a modification to his release conditions, authorizing the defendant to travel, the purpose of which was to go to the Tidewater, Virginia area where the proceedings were taking place, the domestic relations proceedings, for an appearance down there.

The authorization was narrowly tailored to authorize him to travel there. We did acquiesce on a number of occasions for him, either going or returning from such travel, to deviate and meet with his attorneys, his former attorneys, who were located in Baltimore, Maryland, which seemed like a perfectly appropriate, you know, efficiency.

But specific to the authorization to go to Virginia, he was to go essentially there and return, and what the agents

discovered was, in the context of a visit in October of 2023, for purposes of a proceeding, that he had actually also gone to a school where one of his dependent children was a student.  And that certainly wasn't part of the authorization that had been requested.

We alluded to whether or not -- and I'm not here to say whether or not that was in violation of the restrictions imposed on him regarding contact with the children.  As I've said, we've tried to stay out of that, but it may not have been the most appropriate way, which is why it was in fact reported to the government that he did that.

But irrespective of what may have been the case with regard to the Virginia authority's restrictions on either or both parents, it was a violation of the limited authority that he had to travel to Virginia.  So it yet again reflected on this.

And finally -- and this wasn't, obviously, known at the time of the affidavit, but the affidavit in support of the motion to revoke his release and arrest warrant was also used as support for an application for a search warrant that was issued by authorities in the Eastern District of Pennsylvania -- excuse me, the Middle District of Pennsylvania, who authorized the search of the residence as well as vehicle at the time that Mr. Leidel was rearrested in December of 2023.

One of the things they found was a -- and I apologize;

given my age, I'm not a gamer or anything, but apparently, it was a -- like a PlayStation controller for video games which are internet capable and connectible, and they were able to analyze it sufficiently to show that there had been internet connectivity with that device in October and November of 2023, just a few weeks prior to the defendant's rearrest.

The device was found -- I believe it was found in a backpack in a room that he was occupying, in other words, attributable -- at least, you know, by our estimation, attributable to the possession of the defendant, and of course, you know, it was flat out no -- no access whatsoever to the internet.

I would go on to offer that when the agents confronted the parents, Herman Leidel actually acknowledged that he had, you know, handed his internet-capable phone, which was open and not password protected, to his son.  I mean, he had some explanation respecting, you know, proofreading, if you will, or something to that nature.  But clearly, he admitted that he had given his son possession of an internet-capable, non-password-protected device, clearly in contravention of the serious restrictions imposed on him.

And while I'm standing, Judge, I -- and I will concede on this point that I'm less than 100 percent clear, but one of the matters that I suspect you might hear, because it was at least suggested in counsel's motion on appeal, was the notion

that Mr. Leidel -- or actually -- obviously, he's a lieutenant commander in the United States Navy, and at least during the time he was in release status, he was still serving in an active-duty status.  Somewhat surprisingly to the government, his command, located over in Virginia, kept him in an active-duty status.

Now, obviously, virtually all of us in the federal government and most places in the private sector and state and local governments had migrated to many alternatives to in-person work during -- I apologize --

(Court reporter requesting clarification.)

MR. CUNNINGHAM:  Many alternatives -- I'm sorry, I hit the mic -- to in-person work during COVID, but by 2023, one, we were -- we were beyond the necessity for essentially full-time virtual work situations.  Second, the defendant's prior work station was in Northern Virginia.  His parents' residence was in the Scranton, Pennsylvania, area, fully at least five hours' driving distance away.

I personally spoke with his commander, because as I mentioned, I found it highly suspicious that an individual in essentially a very, very restrictive lockdown situation was authorized to remain in an active-duty status, as opposed to being put into an excess leave, non-pay status, which wouldn't have aggregated credit for active duty towards retirement; it wouldn't have been in a pay status, if you will.

And what the captain told me was essentially, well, he was given tasking to review medical literature and report to his captain a couple -- three times a week by telephone, and apparently -- and again, I don't know the details of this, but maybe he supposedly went to the local library, I don't know if materials were mailed to him or otherwise, but as an indicator of how significant or serious this was, I asked the captain for the written product that was produced by the defendant during this nine months -- or actually, it was closer to ten and a half months during which he was in this status, supposedly producing, as would any other active-duty officer have been producing, and the captain advised me that there were no written products or anything that he could provide.

So I offer that because I think that any suggestion that he was continuing to fulfill his responsibilities as an active-duty officer in the Navy are highly suspect.

May I have one moment, Your Honor.

THE COURT:  Of course.

(Conference between Mr. Cunningham and Mr. Sullivan.)

MR. CUNNINGHAM:  Thank you.

Mr. Sullivan just reminded me, as I mentioned to you, the PlayStation platform that the agents found suggests one of two things, either the defendant had that device, which was an internet-capable device -- and in fact, evidence showed that it had accessed the internet -- either the parents didn't know

about it, in which case, you know, he was secreting something from them, or they knew about it, and notwithstanding that, they allowed it in the house.  The rule was very, very specific, that internet-capable devices were supposed to be out of the house, with the exception of the phones, which of course were supposed to have been password protected and kept away from the defendant at any time.

Clearly, that did not happen in this case, Your Honor. And while I acknowledge that I can't tell you whose fingerprint -- whose fingers were on the phone, the evidence is significant here that the activity that Agent Tang identified in his affidavit came from that residence, and given its similarities, given the consistency within which the applications were used and the way it looks, it was the same person who did the underlying crimes of stalking, the defendant, Leidel.  He clearly is not trustworthy to comply with restrictions imposed on him in release, and the parents simply failed to ensure that the restrictions imposed by Judge Xinis were complied with.

Unless you have any specific questions for me, Judge, I'll submit.

THE COURT:  Thank you, AUSA Cunningham.  I do have a few questions, mainly just to clarify for the record a few of the points I believe you made.

I just want to go back, first of all, and just break

it down a little bit, again, focusing right now on the concern about whether or not Mr. Leidel used internet-accessible, internet-capable devices.  It sounds like, from your discussion and based upon what the Court has read in the record, there are two devices you believe Mr. Leidel used that would fall into this category, his father's phone, cell phone, and this gaming device that we've been talking about; is that correct?

MR. CUNNINGHAM:  Judge, with respect to the gaming device, we don't see enough information to say what happened when it connected to the internet, so I'm not suggesting that we saw evidence on that, that it -- consistent with the time frame within which the earlier incidents took place. The suggestion, in fact, is correct as you point out that the earlier incidents resolved to the phone that was in the possession of Herman Leidel.

THE COURT:  Okay.

All right.  And the timing of all of this, if I'm understanding you correctly, the government maintains that Mr. Leidel began engaging in this type of conduct sometime in January of 2023, or shortly thereafter, and then that continued over a period of time.  You then later mention some things that occurred later in the year in 2023, when the gaming device was recovered.  What's the time frame for the actual conduct you're alleging that he actually accessed and used the internet-capable devices?

MR. CUNNINGHAM:  Judge, if you'll bear with me just one second, this was in the -- laid out in Agent Tang's affidavit.  It began January 17th, I think, was the first incident.  There was an incident on January 31st, then in February and March.  Those were the -- the primary communications that resulted in the -- essentially, the renewed investigation into this conduct.  As I said -- then there was this -- essentially, a hiatus in time, during which we didn't find additional communications.  We were investigating.

And you know, Judge Sullivan asked -- and I think the question is legitimate -- well, why -- what was going on between the end of those what we contend were obstructive and -- obstructive kind of communications as well as in violation of Judge Xinis' order and, you know, December, when we moved to revoke, and that was essentially the investigation, to try to identify who was the source of this, and ultimately, we concluded it was the defendant.

THE COURT:  And the communications that are of concern, as the Court understands, there is the email complaint, whatever you want call it, to the FBI Threat Operations Center, there was a separate spoofing of an email to Sarah Sorg, and then also the spoofing of E.S.'s email.  Are those the three communications, or is there something else?

MR. CUNNINGHAM:  There was the communication from E.S. to the Office of the U.S. Attorney, to me, as well, Your Honor.

THE COURT:  So an email purporting to be from E.S. to you --

MR. CUNNINGHAM:  Correct, Your Honor.

THE COURT:  -- that you maintain Mr. Leidel spoofed.

MR. CUNNINGHAM:  Yes, yes.

THE COURT:  Okay.  And was that also in the January through March 2023 time frame?

MR. CUNNINGHAM:  Yes, it was, Your Honor.

THE COURT:  Okay, thank you.

Anything else that I missed?

MR. CUNNINGHAM:  Judge, I can reference for you, that's in Agent Tang's affidavit, which is -- it's on page 21, paragraph 34, and I'll just read it for Your Honor.

It says, "On March 24, at approximately 12:29 Eastern Standard Time, AUSA Cunningham and FBI Special Agent Kuo received an email purportedly from" -- and it's an email address.  It's not masked in here, but it was an email address that had been used by E.S., which was an account -- and it says, "which was an account that belonged to E.S.," and then the content of the email message was as follows -- the print gets smaller, Your Honor, sorry.

It reads, "Sirs, thank you for your help with my custody and visitation case.  If you-all hadn't personally intervened and forgiven me for all of the times that I was not honest with you, I'd hate to imagine would what would become of

my children.  "Sense," S-E-N-S-E, "my lies prevent you from calling me as a witness, will you please keep this case open until January 2024?  If you are still interested in filing criminal charges against me, please let me know, and I will send you all the evidence that I have on others."  And then it's signed with the full name of E.S. and a phone number.

As I mentioned, to begin, the -- obviously, the first thing that agents did with respect to all of these communications was go to the supposed source, and of course, obviously, E.S. denied having said that.  And it -- in the sense that, yes, understood enough having met with agents, having met with government counsel, what the nature of the proceedings were, it's -- on its face, it's sort of patently ridiculous that a witness in a case would send something like that, but it also -- she denied it, and of course, the subsequent analysis of the communication's chain showed that it didn't come from her, it came from this -- it was essentially a spoofed email, as in the underlying crimes.

THE COURT:  And is it the government's position that all of the emails you referenced were sent from the father's iPhone, Herman Leidel's iPhone?

MR. CUNNINGHAM:  Yes, Your Honor, that is what we believe.

THE COURT:  All right.  And again, during the time frame January 2023 through March of 2023.

MR. CUNNINGHAM:  Yes, Your Honor.  If I may, I just want to confirm that -- yeah, the paragraphs in the affidavit sort of go through, serially, the different communications, beginning, I believe, with the January 17th -- I'm sorry -- yeah, it was January 17th, and that begins on page 9 of Agent Tang's affidavit, paragraph 18.  Then -- and that's identified as incident 1.  That was the FOIA request.

Then, incident 2 was January 31st.  That's on page 11 of the affidavit.

Incident No. 3 begins on page 16, and that was communication supposedly to Sarah Sorg on February 22nd.

Incident No. 4 begins on page 19.  That was also on February 22nd.

And the -- the last one I just indicated was incident No. 5, the email on March 24th.

THE COURT:  Thank you.

And again, I just want to walk through to make sure the Court understands the government's position.  One of the arguments in support of Mr. Leidel's detention is that in the government's view, there's clear and convincing evidence that Mr. Leidel accessed and used an internet-accessible device to engage in the conduct we've just been discussing.  That's correct?

MR. CUNNINGHAM:  Yes, Your Honor.

THE COURT:  Okay.  The Court also understands the

government is arguing violations of federal law as separate and independent grounds for detaining Mr. Leidel; is that correct?

MR. CUNNINGHAM:  Yes, Your Honor, but, obviously, we haven't charged these in a superseding indictment.  We do believe that there's evidence of obstruction or attempted obstruction in this case.  There hasn't been, in fact, obstruction of the proceeding.  We're certainly --

THE COURT:  Well, let me ask it this way.  Are you asking the Court to also make probable cause findings as to either the obstruction of a criminal investigation, which would be in violation of 18 U.S.C., Section 1510; tampering with a witness, in violation of 18 U.S.C., Section 1512; or retaliation against a federal law enforcement officer by false claim or of slander of title, in violation of Title 18, U.S. Code, Section 1521?

MR. CUNNINGHAM:  Yes, Your Honor, from the standpoint that Magistrate Judge Sullivan found that standard was met by probable cause, and certainly, we think this Court can do the same thing.

THE COURT:  Okay.  Well, then, I'm going to have to ask you some more questions, because as the Court understands the issues here, the Court could agree with any or all of the points the government is arguing, but on the issue of the alleged criminal violation, it is a probable cause finding.  I'm aware of the prior ruling of the Court, but we have to deal with

this de novo, so I think I would have to ask the government more specific questions as to the relevant statutes and why you feel the evidence supports a probable cause finding.

I know the charges have not been charged, but in looking at some of the statutes, I guess, the Court had a couple of questions about the facts and how they really comport with the statutes. So I'm going to ask them if those are grounds on which the defense -- I'm sorry, the government is arguing the Court should consider revoking Mr. Leidel's pretrial release.

I'm going to start with the obstruction of justice statute, just to kind of walk through at least the Court's understanding of that statute. This is 18 U.S.C., section 1510(a), and my reading of the statute is that it basically says, Whoever willfully endeavors, by means of bribery, to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any persons through a criminal investigator shall be fined under this title, et cetera. And so I just want to be clear about the conduct that the government is arguing satisfies this statute in terms of obstruction of justice.

MR. CUNNINGHAM: Judge, we certainly don't see any bribery in this situation. I think the --

THE COURT: I don't see it either.

MR. CUNNINGHAM: -- the more appropriate sort of consideration here is, when an individual's endeavoring -- and I

apologize that I don't immediately have my fingers on this, but -- I actually think it's probably a statute other than 1510 regarding the obstructive behavior.

THE COURT:  And I guess -- and I'm happy to -- we can talk about it some more, but it seems to the Court, there are multiple grounds on which the government is seeking detention, the first being the one we've been discussing, the alleged violation of the Court's conditions of pretrial release as it relates to the use of internet-accessible devices.  Independent of that, the Court could also find Mr. Leidel to pose a danger to the community if it does make a probable cause finding that he's violated any criminal law, including the ones cited.

But I think for the Court to make a finding, I'm going to have to walk through with the government a little bit more about how the elements are satisfied.  I don't know that that's necessary in this case in terms of the Court's overall ruling, but that's why I'm asking what the basis is.

MR. CUNNINGHAM:  I appreciate that, Judge, and I -- I guess, for efficiency's sake and expediency's sake, I don't think it's necessary.  For purposes of the government's opposition to any change in the defendant's status, to wit, that he's currently detained, I think that you can find by clear and convincing evidence that release conditions would not satisfy the two primary prongs here, one, the appearance in proceedings -- and I acknowledge that we don't have evidence

here to suggest that the defendant is a flight risk.  That's not the primary predicate.  The primary predicate is dangerousness or the obstructive behavior in the context of 3142.

THE COURT:  Mm-hmm.

MR. CUNNINGHAM:  So maybe I have been too cav- --

THE COURT:  Well, would the access to the internet-capable devices and the conduct you have described to the Court -- in your view, does that show that Mr. Leidel poses a danger to the community or to some of the potential witnesses in this case?

MR. CUNNINGHAM:  Yes, Your Honor.

THE COURT:  Okay.

MR. CUNNINGHAM:  Yes.

THE COURT:  I think that's kind of where we can focus in terms of what the Court needs to find.

MR. CUNNINGHAM:  Yes, Your Honor, and that is, in fact, the essence of why we're still in opposition to a release to the custody of any third party but particularly the third-party custody of his parents.

THE COURT:  And just to be clear, some of the individuals that the government maintains -- essentially, where their emails were spoofed by Mr. Leidel, one is the victim in this case; another individual, I believe -- is that one of the codefendants in the case?

MR. CUNNINGHAM:  She was charged -- Sarah Sorg, whose

name I used, was charged in the original complaint.  She was not charged in the indictment, so she's not a codefendant at this point.

THE COURT:  Is she a potential witness in the case?

MR. CUNNINGHAM:  She is a potential witness, and there was, in fact, a strict prohibition against communication with witnesses.

THE COURT:  And so the concern here is potential communication with Ms. Sorg but also the spoofing of her email.

MR. CUNNINGHAM:  Yes, Your Honor.

THE COURT:  Okay.  All right, thank you.  Anything else you want to share with the Court at this time?

MR. CUNNINGHAM:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Well, thank you; that's been very helpful.

I'm going to give counsel for Mr. Leidel, Mr. Hall, a chance to be heard, and then we may circle back based upon what the defense has to say in terms of additional questions from the Court.

Mr. Hall?

MR. HALL:  Yes, Your Honor.

THE COURT:  Do you want call your witnesses, or how would you like to proceed?

MR. HALL:  I will be happy to call the witnesses first and then proceed with our -- with the administration one.

THE COURT:  That's perfectly fine.

MR. HALL:  All right.

THE COURT:  So we'll have the first witness, and we'll have him come to the witness box and be sworn.

MR. HALL:  We have Herman Leidel, who's in the defense witness room.

Mr. Leidel, if you'll come forward and take the witness stand.

THE WITNESS:  Which way do I go?

THE COURT:  Just come straight in, Mr. Leidel, straight through the -- just keep walking forward, and you can go around the podium.  And then, if you'll come right over here.

Take your time.

MR. HALL:  Take the witness stand and remain standing so you can be sworn in.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Come forward.  You can stand there, remain standing, and raise your right hand for me. Thank you, sir.

You do solemnly promise and declare under the penalties of perjury that the information you're about to give to the Court in the matter now pending before it shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

Please watch your step.

Speak loudly and clearly into the microphone.  State your full name for the record and spell your first and last names.

THE WITNESS:  Herman E. Leidel, Jr., first name, H-E-R-M-A-N, last name, L-E-I-D-E-L.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  And Mr. Leidel, if you're comfortable doing so, you may lower your mask during the course of your testimony, however you wish to proceed.

THE WITNESS:  Okay, thank you.

THE COURT:  And good morning.

Mr. Hall.

MR. HALL:  Thank you, Your Honor.

HERMAN E. LEIDEL, JR., DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MR. HALL:

Q.   Mr. Leidel, let me begin with, where do you live?

A.   █████ --

Q.   You don't have to give me the exact address; just the city.

A.   Scranton, Pennsylvania.

Q.   And who do you live in your home in Scranton, Pennsylvania with?

A.   My wife.

Q.   And was there a period of time in which your son,

Jason Leidel, was living with you?

A.   Yes.

Q.   And what was that period of time?

A.   He lived with us up until December of last year, from October, I believe it was, until December.

Q.   And during the time that your son was living with you, you understood that he was a facing criminal charge; is that correct?

A.   Yes.

Q.   And when he was facing this criminal charge, it was your understanding that the judge had allowed him to live at your address on pretrial release; is that correct?

A.   Yes.

Q.   All right.  Now, as a condition of his pretrial release, were there responsibilities that you had?

A.   Yes.

Q.   And what were those responsibilities, as you understand them?

A.   To get rid of the internet, and cell phone, and ...

Q.   Okay.  Now, what did you do in order to make sure that Mr. Leidel did not have access to the internet?

A.   We called Verizon, and they turned it off.

Q.   And that was the Wi-Fi in your house was turned off?

A.   Yes, yeah.

Q.   You were allowed to keep your own personal cell phone; is

that correct?

A.   Yes.

Q.   And your wife was also allowed to keep a cell phone; is that correct?

A.   Yes.

Q.   Okay.  Now, what was your understanding of what relationship your son or what contact your son could have with your cell phone?

A.   None.

Q.   When Mr. Leidel was released to your custody, did his attorney at that time have him -- have you sign an affidavit concerning internet access?

A.   Yes.

Q.   Okay.  Now, I'm going to show you what is Defense Witness 1, and I'm going to ask you -- I'll zoom out a little bit so you can see the whole thing.  And tell me if you recognize the beginning of that document.

A.   Yes.

Q.   Okay.  And does that appear to be the affidavit that you signed?

A.   Yes.

Q.   Now, I'm going to show you the second page of this document, and do you recognize the signature there?

A.   Yes.

Q.   And whose signature is that at the top of the page?

A.   That is mine.

Q.   And that is your signature, and that is dated January 4th, 2023; is that correct?

A.   That's correct.

Q.   And when you signed this, did you signed sign it in front of a notary?

A.   Yes.

Q.   And do you see the notary's signature on the bottom?

A.   Yes.

Q.   And that was notarized by Jennifer Smith; is that correct?

A.   Correct.

Q.   And do you know who Jennifer Smith was?

A.   Yes.

Q.   And who is she?

A.   She, I believe, is a -- she worked with Jason's former attorney.

Q.   Okay.  Now, Mr. Leidel, during that period of time in which Jason was living at your home, did you ever allow him to access the internet?

A.   No.

Q.   Was there any ability to access the internet from your home, as far as you know?

A.   No.

Q.   And was there a -- some sort of gaming device in the house, to play video games?

A.   Several of them, yeah, yes.

Q.   Did you know whether or not those were -- could be used to access the internet?

A.   Well, no, access to the internet, no; there was no internet.

Q.   Because you had had it disabled by Verizon; is that correct?

A.   Yeah.

Q.   Okay.  And was there ever a time in which you left your cell phone at home by accident?

A.   Yes.

Q.   And do you recall approximately when that was?

A.   Nah -- fall, winter.  I mean, I -- no, I don't remember the exact date, no.

Q.   Okay.  Do you work close by?

A.   I do, yes.

Q.   How far away is your work?

A.   Seven blocks.

Q.   On the day that you left your cell phone at home by accident, did you remember it after you got to work?

A.   Could you repeat that?

Q.   Did you remember after you got to work that you had left your cell phone at home that day?

A.   Oh, yes.

Q.   And what did you do about that?

A.   I went back and went up to my bedroom and got it.

Q.   Okay.  And why did you go back to get it?

A.   Well, just to have my cell phone with me.

Q.   Now, part of the allegation here is that there were certain applications downloaded to your phone which were similar to the ones that your son allegedly had used in the past, such as VPN, Proton email, Pinger.  Are you aware of those applications being on your phone?

A.   Yes.

Q.   How did they get there?

A.   I put them on there.

Q.   Why?

A.   Well, my son is in a custody battle, and I wanted to know what he was -- they keep accusing him of something, and I investigated, and that's what I did.

Q.   So you downloaded those applications in order for you to see what it was --

A.   To see what it was about.

Q.   -- to better understand what your son was charged with?

         THE COURT:  Defense counsel, you-all are talking over each other.

         MR. HALL:  Apologize, Your Honor.

         THE COURT:  So we just need to slow it down just a little bit.  Ask the question, and then, Mr. Leidel, wait for the question, and then you can respond, okay?  Let's try again.

HERMAN E. LEIDEL, JR. - CROSS-EXAMINATION

BY MR. HALL:

Q.   So you downloaded those applications so you could understand better what your son was accused of?

A.   That is correct.

Q.   Okay.  And if I understand your testimony correctly, during that period of time that your son was living at home, you never allowed him to use the internet or your phone; is that correct?

A.   That is correct.

Q.   Okay.  Does your wife know your password to your phone?

A.   I -- it's --

Q.   Have you ever given it to her?

A.   No.

Q.   Okay, all right.

         MR. HALL:  That's all the questions I have of this witness, Your Honor.

         THE COURT:  Thank you very much, Mr. Hall.

         Is there any cross-examination of this witness?

         MR. SULLIVAN:  Yes, Your Honor.

         THE COURT:  Please proceed.

                    CROSS-EXAMINATION

BY MR. SULLIVAN:

Q.   Good morning, Mr. Leidel.

A.   Hi.

Q.   My name is Thomas Sullivan.  I'm going to be asking you some questions today.  If you don't understand the question or

you want me to repeat it, can you please let me know?

A.   Okay.

Q.   Thank you.

Do you recall the day that your son was arrested, December 7th, 2023?

A.   Yes.

Q.   Okay.  When did you first learn that your son was arrested?

A.   When I got home from work.

Q.   Okay.  Did any law enforcement agents come to your place of work that day?

A.   Yes.

Q.   Okay.  And that was before you went back home?

A.   Correct.

Q.   Okay.  So when they approached you, you were in a break room at the hospital; is that correct?

A.   No.

Q.   Okay.  Where were you in the hospital when law enforcement agents approached you?

A.   On Madison Avenue.

Q.   I'm sorry, sir?

A.   On Madison Avenue.

Q.   Okay.  So you were on the street?

A.   Yes.

Q.   Okay.  Did law enforcement agents ask you about -- to get your phone?

A.    Could you repeat that?

Q.    Did law enforcement agents ask if they could take your phone, that they wanted to seize your phone?

A.    No.

Q.    And where is Madison Avenue in relation to the hospital, where you work?

A.    That would be the back of the hospital.

Q.    So it's your testimony that the first time law enforcement agents encountered you, you were outside of the hospital?

A.    Could you repeat that?

Q.    Sure.

      The first time that you saw law enforcement officers on the morning of December 7th, you were outside of the hospital, not inside the hospital?

A.    That's not correct, no.

Q.    Okay.  Then where were you when you first encountered the law enforcement officers on December 7th, 2023?

A.    I was on my floor, the 7th floor.

Q.    Okay.  And where, specifically, on the 7th floor of the hospital?

A.    The corridor, the hallway.

Q.    Okay.  Did the agents, law enforcement agents ask to take your phone?

A.    No, that -- no.

Q.    Okay.  Did you have your phone with you at the hospital

that morning?

A.    It was at the ho- -- yes, yes.

Q.    Where exactly was it?

A.    On my desk.

Q.    Okay.  Did you ever tell law enforcement agents that you left your phone at the house that morning?

A.    No.

Q.    Did you have any other conversation with law enforcement at that time?

A.    Yes.

Q.    What did you say to them, what did they say to you?

A.    They asked if I had my phone on me, I said no.  And then, they said that they had search warrant and they were going to check my car, and I said, Well, the key is in my jacket.  And they said, Oh, we already have a key.  And that was it.

Q.    At that point, did they ask you where your phone was located?

A.    No.

Q.    Did there come a time later that morning you went back to your house?

A.    Yes.

Q.    Okay.  And did there come a time when law enforcement found your phone or they recovered your phone?

A.    Can you be more specific?

Q.    Sure.

When you were at the hospital when you first talked to the agents, your testimony is that your phone was on your desk?

A.   Yes.

(Court reporter requesting clarification.)

A.   Yes.

MR. SULLIVAN:  Sorry about that.

BY MR. SULLIVAN:

Q.   And your testimony is that the law enforcement agents left the hospital without taking your phone?

A.   Yes.

Q.   Did you tell the law enforcement agents in that meeting that, My phone is on my desk?

A.   No.

Q.   And they didn't ask you if you had your phone?

A.   No -- wait a minute, repeat that?

Q.   In the morning, when you were at the hospital, did the agents ask you the location of your phone?

A.   Yes.

Q.   Okay.  Did you answer them?

A.   Yes.

Q.   What did you tell them?

A.   It was on my desk.

Q.   Are you referring to a desk at your home or a desk at the hospital?

A.   At work.

Q.    Okay.  Did there come a time later that day that you came back to your house?

A.    Yes.

Q.    Did you talk with law enforcement agents about your phone at the house?

A.    Yes.

Q.    Okay.  At what point did law enforcement get possession of your phone?

A.    About 20 minutes after I got back home.

Q.    Did you give them the phone, or did they find it some other way?

A.    I gave it to them.

Q.    Did you say anything to them when you handed them the phone?

A.    "Here."

Q.    Did you give them the phone just voluntarily, or was it in response to a question by law enforcement to get your phone?

A.    Repeat that?

Q.    Sure.

       When -- your testimony so far is that you were at the hospital, the phone was on your desk.  They didn't seize your phone; is that -- so far I have it right?

A.    Yes.

Q.    Then you traveled back to your house?

A.    Yes.

HERMAN E. LEIDEL, JR. - CROSS-EXAMINATION

Q.   And then at some point when you got back to your house, law enforcement got your phone back -- got your phone.

A.   They took me back to the hospital.

Q.   They took you back to -- okay.

So you got back to your house, law enforcement was there, and at that point, you tell them, "My phone is at the hospital"?

A.   Yes.

Q.   Okay.  They come back, and then they get the phone -- they take you back to the hospital and get the phone; is that what happened?

A.   Yes.

Q.   What is a VPN, V as in Victor, P as in prairie, N as in Nancy?

A.   It's -- I'm not quite sure what those -- they stand for, but it's something -- it hides your searches and identity on your phone.  That's what I believe it is.

Q.   I'm sorry, I missed the last part, sir.

A.   That's what I believe it is.

Q.   And how did that -- how did you get that VPN onto your phone?

A.   You Google it and download it, one of them.  I mean, there's many of them.

Q.   And do you recall how much you were paying a month for that VPN service?

A.   It was a free thing, it was just -- it was nothing; it was

like a trial.

Q.    Okay.  And did you use it for their -- just the trial period, or did you continue to use it and have to pay a monthly fee?

A.    I just got rid of it.

Q.    And do you remember the name of the VPN that you downloaded?

A.    No, not sure either of -- no, no.

Q.    And are you familiar with an application known as Pinger, P-I-N-G-E-R?

A.    Yes.

Q.    What was Pinger?

A.    That's where you go incognito for email, and it's -- yeah, that's what I --

Q.    And your testimony earlier, when Mr. Hall was questioning you, is that you got those applications to do some sort of research about your son's case; is that correct?

A.    No, to see what they were.  That's it, to see what they were.

Q.    Okay.  At any point, did law enforcement ask you why you downloaded those applications?

A.    No.

Q.    Did you ever tell -- that day, did you tell law enforcement that the girls at work told you to use the applications?

A.    Re- -- repeat that?

HERMAN E. LEIDEL, JR. - CROSS-EXAMINATION

Q.   Sure.

     That day, did you ever tell law enforcement that you downloaded those applications to your phone because the "girls at work" told you to use them?

A.   No, no.

Q.   So you don't remember saying that to law enforcement?

A.   I did not say that.

Q.   Okay.  Did you -- you testified on direct that you did not tell your wife your password, is that correct, for your phone?

A.   When?

Q.   Ever.

A.   Can you be more specific?

Q.   Do you remember Mr. Hall asking you questions about whether your wife knew the password to your phone?

A.   Yes.

Q.   And you remember answering that question?

A.   Yes.

Q.   Okay.  Did your son ever have the password to your phone?

A.   No.

Q.   Did your son ever access or ever use your cellular phone?

A.   No.

Q.   Did law enforcement ever ask you whether Mr. Leidel, the defendant, used your phone?

A.   Yes.

Q.   And what was your answer?

A.   I believe I told him -- I showed him something on my phone.

Q.   What did you show him on your phone?

A.   I'm not quite sure what it was.

Q.   And was it one time, or was it more than one time that you showed him --

A.   One time.

Q.   Okay.  And did there ever come a time that you told law enforcement that you showed your son your phone so he could spell-check text messages or emails?

A.   No.

Q.   Do you play video games?

A.   Yes.

Q.   What video games do you play?

A.   All the classic ones.  I mean, Frog, Asteroids, Sonic.

Q.   Let me be more specific.  Do you play video games at your home, or specific- -- more specifically, since your son has been released from custody, did you play video games in your hose?

A.   Yeah, I have.

Q.   What games have you played?

A.   I believe, Super Mario 2.

Q.   And on what device did you use that?

A.   Nintendo.

Q.   Okay.  And are you aware whether Nintendo has access to the internet?

A.   It does not.

Q.   Okay.  And you know that for a fact?

A.   I don't have internet -- I didn't have internet in my house.

Q.   Okay.  Do you -- do you ever use a PlayStation, TSP?

A.   No, no.

Q.   Any idea how that was found in your son's home -- in your son's bedroom?

A.   No, no.

Q.   Did you ever take any steps to ensure that your son, after he was released, didn't have internet devices in your house?

A.   By turning off the internet.  We turned it off.

Q.   Did you ever check to see whether, after that, he got a device that could be accessible to the internet?

A.   I've gone through the room, yes, yes.

Q.   So are you -- you're aware of the allegations in the case that your son accessed -- that there was an internet device that was accessed in at least November of 2023; are you aware of that?

A.   Yes.

Q.   Do you know -- was there any internet access at your house in November of 2023?

A.   No.

Q.   Okay.  So do you have any idea how somebody would have accessed the internet from your house in November of 2023?

A.   No.

(Conference between Mr. Cunningham and Mr. Sullivan.)

MR. SULLIVAN:  Your Honor, nothing further.

THE COURT:  Thank you very much, Mr. Sullivan.

Is there any redirect for this witness from the defense?

MR. HALL:  Yes, Your Honor, just very quickly.

REDIRECT EXAMINATION

BY MR. HALL:

Q.  Mr. Leidel, when you were answering questions, were you having any trouble hearing?

A.  Yes.

Q.  Do you have problems with your hearing?

A.  Yeah.

Q.  Okay.  And does it work better for you if we keep our voices up, so -- like I'm doing right now?

A.  Sure, yeah.

Q.  Okay.  Now, Mr. Sullivan was just asking you about the PlayStation that was found in your son's room.  Were you even aware that a PlayStation can connect with the internet?

A.  No.

Q.  Okay.

MR. HALL:  That's all the questions I have of Mr. Leidel.

THE COURT:  Thank you very much, Mr. Hall.

Those are all the questions of Mr. Leidel.

Mr. Leidel, you may step down at this time.  Thank you for your testimony.

THE WITNESS:  Thank you.

MR. HALL:  And I'll call Mrs. Leidel as the next witness, Your Honor.

Mrs. Leidel, if you would come forward --

I'm sorry, Your Honor.

THE COURT:  I was going to say the same thing.

Please just come all the way forward, Mrs. Leidel, and come over by the witness stand.  And if you could remain standing once you've -- come on forward.  If you could just remain standing when you get over here; take your time.

THE WITNESS:  Over here?

THE COURT:  Yes, ma'am, and just remain standing when you get over to the box.

THE WITNESS:  Okay.

Okay.  And then the deputy will swear you in.

THE COURTROOM DEPUTY:  Please raise your right hand.

You do solemnly promise and declare under the penalties of perjury that the information you are about to give to the Court in the matter now pending before it shall be truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  You may be seated. Please watch your step.

Speak loudly and clearly into the microphone.  State your full name for the record and spell your first and last name.

THE WITNESS:  Okay.  My first name is Charlene, C-H-A-R-L-E-N-E, my last name is Leidel, L-E-I-D-E-L.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  And Ms. Leidel, if you wish, you can remove your mask during your testimony.

THE WITNESS:  Thank you.

THE COURT:  Mr. Hall.

CHARLENE LEIDEL, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MR. HALL:

Q.   Good morning, Ms. Leidel.

A.   Good morning.

Q.   You're married to Herman Leidel?

A.   Yes.

Q.   Okay.  And you have a son, Jason Leidel?

A.   Yes.

Q.   And did there come a time -- well, you're -- strike that.

You are aware that your son, Jason Leidel, has criminal charges against him, correct?

A.   Correct.

Q.   And did there come a time when he was released from detention and allowed to live in your home in Scranton,

Pennsylvania?

A.    Yes.

Q.    What was your understanding of your obligations to the Court during the time that he was living in your home?

A.    That he was not to use our password protected cell phones.

Q.    And what about the internet?

A.    We didn't have any internet.

Q.    Okay.  Why did you not have internet at that time?

A.    Because that was one of the judge's rules in order for Jason to come live with us; we had to get rid of all the internet.

Q.    And what did you-all do in order to get rid of the internet?

A.    We -- at the time, we had Verizon, and we called Verizon to shut off our internet.

Q.    During the time that your son was living in the home, was there ever a time in which you had the internet reestablished or reinstalled?

A.    Absolutely not.

Q.    Okay.  Do you recall that you signed an affidavit promising that you would not allow your son to have access to the internet?

A.    Yes.

Q.    Okay.  I'm going to show you what's Defense 2.  Do you see that document?

A.   Yes.

Q.   Does that look familiar to you?

A.   Yes.

Q.   And does that have your name on it, Affidavit of Charlene Leidel?

A.   Yes.

Q.   Okay.  And that document was prepared by the previous attorney for Mr. Leidel?

A.   Yes.

Q.   Now, on the second page of that document, do you see a place for a signature?

A.   Yes.

Q.   And do you see the signature there dated January 4th, 2023?

A.   Yes.

Q.   And is that your signature?

A.   Yes.

Q.   And this is something that you signed in the presence of the notary public; is that correct?

A.   Correct.

Q.   And the notary public's signature appears below that; is that correct?

A.   Correct.

Q.   Now, during the time period that your son, Jason, was living in the home from January of 2023 until he was arrested in December of 2023, did you ever allow your son to use your phone,

or your husband's phone, or any other type of device in order to access the internet?

A.   No.

Q.   And during that period of time, there was a Sony PlayStation in the house.  Are you aware of that?

A.   Yes.

Q.   And were you aware whether or not that could be used in order to access the internet?

A.   There was no internet in the house.

Q.   Okay.  And that is because you had Verizon remove internet capability from your account; is that right?

A.   Correct.

Q.   Okay.

MR. HALL:  That's all the questions I have.

THE COURT:  Thank you very much, Mr. Hall.

Is there any cross-examination of this witness?

MR. CUNNINGHAM:  Yes, Your Honor.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. CUNNINGHAM:

Q.   Ms. Leidel, I want to make sure I understand the sequence. The exhibit that Mr. Hall showed you, your affidavit, was signed on January 4th, right?

A.   Correct.

Q.   And were you present when your son had a hearing before

Judge Xinis in this courthouse on January 3rd of 2023?

A.   Yes.

Q.   And so you heard Judge Xinis articulate all of the restrictions that would be imposed as well as the responsibilities that you and your husband, as third-party custodians, were undertaking, right?

A.   Correct.

Q.   And you probably don't remember it, but January 3rd of 2023 happened to be -- I think it was a Tuesday, okay; do you accept that?

And January 4th --

(Court reporter requesting clarification.)

A.   Yes.

BY MR. CUNNINGHAM:

Q.   You accept that January 3rd was a Tuesday?

A.   If that's what you're saying yes, yeah.

Q.   Okay.  Now, did you leave Baltimore -- or excuse me, Greenbelt, return to Scranton, Pennsylvania on the 3rd and then come back to Baltimore on the 4th to execute --

A.   No, we stayed at a hotel.

Q.   You did.

A.   Yes.

Q.   Okay.  So did -- so I'm curious, though; then you said, on the 4th, "I have removed all internet-capable devices from my home located in Scranton, Pennsylvania."  If you hadn't traveled

back to Scranton on the 3rd, how had you removed everything?

A.   Our daughter did it.

Q.   So you took your daughter's word for it?

A.   Well, yeah.

Q.   She went -- did she take all your computers away and everything like that?

A.   Yes.

Q.   And so if we contacted Verizon, we'd find out that on the 3rd or the 4th, you called up and told them to cancel your Wi-Fi service?

A.   We called, yes.

Q.   Okay.  Do you remember -- did you call from here, in Baltimore?

A.   I don't know when Herman called, because it was in Herman's name, so he had to be the one that --

Q.   I see.

A.   Yeah.

Q.   And -- now, we know that your husband had a phone that the FBI seized when they came and executed the search warrant at your house and arrested your son on December 8th of 2023.

A.   Correct, but my son wasn't arrested at the house, right?

Q.   Right, right, but that day, he was arrested.

A.   Right.

Q.   And in fact, you -- the agents actually took your husband's phone and handed it to you, and you opened it, right?

A.   The agents didn't hand it to me.

Q.   Who handed it to you?

A.   I got it from Herman.

Q.   Oh, you took Herman's phone?

A.   No, he was standing behind me, yeah.

Q.   But you actually opened it and gave it to the agent?

A.   With him telling me what the numbers were, because he -- right, because he -- right, he couldn't remember, like he was too nervous, so -- right.

Q.   He couldn't remember the number.

A.   Well, no, no, no, he couldn't give -- he was so nervous that he was trying to press the buttons -- he -- no, he was standing behind me, and he tried to get in there.  And he couldn't do it because he was nervous, so he handed me the phone, and then he told me what his numbers were.

Q.   What were those numbers?

A.   I don't remember.  I mean, because, you know -- they were changed so many times; they were recently just changed on that day.  I don't know.

Q.   Do you remember how many digits it was?

A.   It -- it was either five or six; I don't know.

Q.   Do you have a smartphone or a phone yourself?

A.   I do, yes.

Q.   And was it password protected?

A.   It's always been password protected.

Q.   Is it digits, or a name, or a combination of alphanumeric --

A.   Do I have to answer that?

Q.   I didn't ask you what it was.

A.   Okay.

Q.   I asked you, is it specific digits or specific alphanumeric, or a name, or a combination of --

A.   Well, they're different.  I mean -- I mean, because I've changed it so many times so ...

Q.   Do you usually change it to something that's easy for you to remember?

A.   No.

Q.   So do you write it down?

A.   I try to remember it.  No, I don't write anything down, no.

Q.   So your -- what your testimony is, so I'm clear about this, is that your husband handed you the phone, and then told you what the password was, that you put into his phone and then gave it to the agents?

A.   Yes.

Q.   Are you familiar with the term a "hotspot" or a "personal hotspot" on a phone?

A.   I've heard of them, yes.

Q.   Do you know what it is?

A.   100 percent, no.

Q.   Did you know that your husband had loaded a number of

applications onto his phone that were similar to if not exactly the same as some of the applications that were identified in the affidavit in support of the original charging document of your son?

A.    I don't know what he downloads on his phone.

Q.    You had -- had no idea what was on his phone?

A.    No.

Q.    Did you work outside the home?

A.    I did.

Q.    And during the time that your son was living in your home, you were periodically working outside the home?

A.    Yes.

Q.    What was your employment?

A.    My employment was a second shift supervisor.

Q.    And what were your hours?

A.    My hours were -- I would go in for 3:00, and I would get home probably about 12:30.

Q.    And what were your husband's employment hours?

A.    His hours were 7:00 to 3:30.

Q.    Okay.  So were there periods of time when your son was alone in your home?

A.    Yes.

Q.    Okay.

A.    Yeah, they said it was okay.

Q.    Did he ever leave the home to go to any local business

establishments, or libraries, or recreational facilities?

A.   Who's that?

Q.   Your son.

A.   My son only was out of the house with the motions that were approved, going to church, going to -- to hearings in Virginia Beach, and to meet his lawyers.

Q.   Okay.

A.   In Baltimore.

Q.   So that -- to your knowledge, those were the only occasions when he was gone?

A.   Yes.

Q.   Okay.  Did you have any occasion, while your son was living with you during release status, to enter the room where he was staying, where he stayed when he was with you?

A.   Yes.

Q.   And did you know that there was a device in there that was an internet-capable device, a PlayStation controller device?

A.   I knew that was there, yes.

Q.   Okay.  Did it dawn on you to check to see whether or not this was an internet-capable device?

A.   We had no Wi-Fi in the house.

Q.   But weren't the orders from the judge to and didn't you attest to the fact that you would remove all internet-capable devices, irrespective of whether there was Wi-Fi; you were supposed to remove all internet-capable devices, right?

A.    Yes.

Q.    This was an internet-capable device that you didn't remove, right?

A.    No, I didn't know that it was internet-capable, because there was no -- there was no Wi-Fi.

Q.    Well, wait.  Before, you told me -- when I asked you that question, you said there was no Wi-Fi, as if it didn't matter.  Now you're saying that you didn't remove it because you didn't know it was an internet-capable device; is that what you're saying now?

A.    No, I'm saying that there was no Wi-Fi in the house.

Q.    So you knew it was an internet-capable device, but --

A.    I did not know it was an internet-capable device.

      I don't know anything about them, about handheld games.

      MR. CUNNINGHAM:  Judge, I have nothing further for Mrs. Leidel.

      THE COURT:  Thank you very much, AUSA Cunningham.

      Is there any redirect from the defense?

      MR. HALL:  No, Your Honor.

      THE COURT:  You don't have any --

      MR. HALL:  No.

      THE COURT:  Okay, fine.

      Ms. Leidel, thank you so much for your testimony; you may step down.  And please take your time in returning to your seat.

MR. HALL:  Your Honor, I take it, now that their testimony is complete, Mr. and Mrs. Leidel could remain in the courtroom?

THE COURT:  If there is no objection from the government --

MR. CUNNINGHAM:  No, Your Honor.

THE COURT:  Okay, then that will be fine if they wish to remain in the courtroom.

So if you wish, you may take a seat --

THE WITNESS:  Can I sit --

THE COURT:  Yes, you can both take a seat.  Take your time.

MR. HALL:  Just sit anywhere other than the front rows.

THE WITNESS:  Okay.

THE COURT:  Mr. Hall.

MR. HALL:  Thank you, Your Honor.

In this case, we filed, obviously, this motion to have the --

MR. CUNNINGHAM:  I'm sorry to interrupt, Judge.  I did have one thing; I may have misunderstood.

Is that the conclusion of the evidence --

MR. HALL:  Yes.

MR. CUNNINGHAM:  -- or witnesses?

Judge, I would request permission, just for very brief

rebuttal purposes, to call Special Agent Tang, relevant to the confrontation that the agents had on December 8th when they went to Scranton.

THE COURT:  Okay.  All right, so you'd like to call your witness, but just a moment; let me just understand where we are with Mr. Hall first because I'm not quite clear.

Are you done presenting your witness testimony?

MR. HALL:  Witness testimony, yes.

THE COURT:  Okay.

MR. HALL:  I was ready to proceed with my argument --

THE COURT:  Okay.

MR. HALL:  -- but if they want call a witness, they certainly -- we can certainly do that first before I --

THE COURT:  All right, all right.

And you have one witness you want to call.

MR. CUNNINGHAM:  Just one witness, Special Agent Tang, and I will limit it very specifically to the December 8th [sic] encounter with Mr. and Mrs. Leidel.

THE COURT:  All right.  I'll let the government call the witness.  I'm going to suggest we take maybe a two-minute break, since we're close to two hours, and then when we come back, we'll have that witness and see where we are.

MR. CUNNINGHAM:  Thank you, Your Honor.

THE COURT:  So let's recess for two minutes; when we come back, we'll have the government's witness.

MR. CUNNINGHAM:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court stands in recess.

(Recess taken from 11:39 a.m. - 11:42 a.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now resumes in session.

THE COURT:  Thank you.  Please be seated except for our witness, and we'll have him sworn in.

THE COURTROOM DEPUTY:  Please raise your right hand.

You do solemnly promise and declare under the penalties of perjury that the information you're about to give to the Court in the matter now pending before it shall be truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  You may be seated.

Speak loudly and clearly into the microphone.  State your full name for the record and spell your first and last names.

THE WITNESS:  Amos Tang, A-M-O-S, T-A-N-G.

THE COURT:  You may lower your mask if you wish.

THE WITNESS:  Thank you, Your Honor.

MR. CUNNINGHAM:  And you are --

THE COURT:  Mr. Cunningham.

MR. CUNNINGHAM:  I'm sorry, Judge.

THE COURT:  Go ahead, Counsel.

AMOS TANG, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. CUNNINGHAM:

Q.   You are a special agent with the Federal Bureau of Investigation; is that correct?

A.   Yes.

Q.   Agent Tang, were you the affiant on the affidavit that was submitted in support of a search warrant as well as a motion to revoke the defendant's release back in December of 2023?

A.   Yes.

Q.   And you've had an occasion in the past couple of months periodically to review that affidavit, right?

A.   Yes.

Q.   I want speak to you specifically about the incidents or the events of December 8th in Scranton, Pennsylvania.  You and other federal law enforcement agents went -- I said December 8th; I misspoke.  It was December 7th, correct?

A.   Yes.

Q.   You and other agents went to Scranton, Pennsylvania, to execute the warrants in this case, right?

A.   That's correct.

Q.   And did you have occasion that day to encounter the defendant's father, Herman Leidel?

A.   Yes.

Q.   Where did you first encounter him?

A.   The first encounter with myself and Mr. Herman Leidel was at the hospital in Scranton.

Q.   Were you accompanied by anybody at that time?

A.   Yes, I was accompanied by an FBI task force officer that was assigned to FBI screening.

Q.   Okay.  Any other federal agents, to your recollection?

A.   Yes.

Q.   Who?

A.   Special Agent Daniel Irving.

Q.   Okay.  And Special Agent Irving is actually in court.  He is a special agent with the Department of Transportation, right?

A.   Yes.

Q.   All right.  What was your purpose for trying to have a contact with Mr. Herman Leidel?

A.   Well, we wanted to interview him, and we also needed to serve and execute the search warrant on the vehicle.

Q.   On the vehicle.  Were you searching -- were you looking for something in particular that you thought was associated with Herman Leidel?

A.   Yes.

Q.   What was that?

A.   We wanted to locate Herman Leidel's cell phone.

Q.   Okay.

     All right.  Where was it that you -- if you said it, I apologize.  Where was it that you first had an encounter with

Herman Leidel?

A.   I believe it was at his place of employment at the hospital.

Q.   Okay.  Do you remember specifically whether it was inside or outside the hospital?

A.   It was inside of the hospital, in the vicinity of his employee break room.

(Court reporter requesting clarification.)

A.   In the vicinity of the employee break room.

BY MR. CUNNINGHAM:

Q.   Agent Tang, it's really important the court reporter hear everything you say.  There's a microphone over there.  Please move it so that it's close to you, and you sit close to it.

Did you tell Herman Leidel why you were there?

A.   Yes.

Q.   What did you say to him?

A.   I can't recall the exact words, but I identified myself, I explained the purpose of the interaction.

Q.   Keep your voice up; don't drop.

A.   I identified myself.  I explained the purpose of the interaction, and that we had a warrant to search the vehicle, and that we were looking for his cell phone.

Q.   And did he tell you where his cell phone was?

A.   Yes, he advised that he had left his cell phone at the residence.

Q.   So at first, he denied having the phone on his person, right?

A.   That's correct.

Q.   Did he say whether it was in the car?

A.   I don't believe so.  I can't recall.

Q.   Well, did he, in fact, say it was at the residence?

A.   I believe so.

Q.   All right.  As a result of that initial encounter, what did you and the other agents do?

A.   Myself and another agent executed the search warrant on the vehicle.

Q.   Did you find the cell phone in the vehicle?

A.   No, we did not.

Q.   Okay.  Did you find anything of apparent evidentiary value in the vehicle?

A.   No.

Q.   All right.  Following that search of the vehicle, what did you do then?

A.   I returned to the residence, to assist with completion of the search of the residence.

Q.   And who was present at the residence when you got there?

A.   Charlene Leidel and other agents that were executing the warrant.

Q.   Was the defendant there?

A.   No.

Q.   Do you know where he was?

A.   He had been arrested.

Q.   Okay.  Do you know where he was when he was arrested?

A.   He was at the -- the courthouse in Scranton.

Q.   And do you know why he was at the courthouse in Scranton?

A.   He was checking in with parole and probation.

Q.   Okay.  The people supervising his release status at that time?

A.   Correct.

Q.   Okay.  So when you got back to the residence, was Herman Leidel present?

A.   Herman Leidel arrived shortly after I arrived.

Q.   All right.  And did you have any further communication with him at the residence regarding the cell phone?

A.   I did.

Q.   Tell the Court, please, what that communication was.

A.   So upon Herman Leidel's arrival at the residence, we again asked him where his cell phone was, to which he responded that he had left it at the hospital in his jacket pocket.

Q.   And upon hearing that the phone wasn't on his person at that time, what did you and the other agents then do?

A.   I remained at the residence, and Special Agent Irving and another FBI task force officer assigned to the Scranton FBI accompanied him back to the hospital to retrieve his cell phone.

Q.   Did you ever have any further encounter or see

AMOS TANG - DIRECT EXAMINATION

Herman Leidel that day?

A.   Yes.  Following the return to the hospital to recover his cell phone, Herman Leidel came back to the residence, and we conducted an interview of Herman Leidel.

Q.   Had you obtained the phone prior to conducting the interview, or was there -- was he interviewed immediately?

A.   I think the exact sequence of events was, upon his arrival back to the residence, we confronted Herman Leidel about the phone.  We asked him to unlock the phone so that we could review it, and he declined, at which point he offered his phone to Charlene Leidel, who unlocked the phone for us using his passcode, so that we could look at the specific identifiers of the phone, specifically, the IMEI, and the iCloud account information, and the phone number.

Q.   So did -- I want you to be specific about the way in which -- you said Charlene Leidel, Mrs. Leidel took possession of his phone.

A.   That's correct.

Q.   And she unlocked it, and did she give it to you or one of the other agents?

A.   She provided me with the phone.

Q.   Okay.  Did you see Mr. Leidel in communication with her as she was unlocking?

A.   I was -- I was present in the room when they were speaking to one another.

Q.   Okay.  So you didn't know what they might have said?

A.   I heard some things, but I can't recall the exact words.

Q.   Okay.  So it's possible he gave her the password that allowed her to unlock the phone?

A.   No, I believe she knew his password.

Q.   Why do you believe that?

A.   Because I would have recalled if he had told her what the password was.

Q.   So you heard enough to know that he wasn't --

A.   Correct; I was listening to the conversation, I was there, but I don't recall the exact words.

Q.   Okay.  But you -- okay, enough.

So upon getting the phone, you said she unlocked it and you were able to access some of the information on the phone.

A.   Correct.

Q.   And when you looked at it, was the preliminary information -- well, strike that.

Did you find certain things on the phone that prompted you then to have communication with Herman Leidel?

A.   Yes.

Q.   What was it that you were able to preliminarily see?

A.   So upon receiving the phone from Charlene Leidel, I went to the technical information regarding the device.  The technical information, specifically, the international mobile equipment identifier, the IMEI -- it's very similar to like a serial

number, that is specific to that device -- and I also looked at the icon information, as well as the particular iPhone make and model.

And the reason why I did that was because, as part of the probable cause that we submitted for the search warrant to the residence, we had done a 2703(d) order to Apple, and the records from Apple indicated that a particular device belonging to the Apple subscriber records for Herman Leidel had downloaded specific iPhone applications that were involved in the suspicious activity that resulted in the subsequent investigation following Jason Leidel's pretrial detention release.

Q.   And did you find evidence of that on the phone, in this preliminary review?

A.   In the preliminary review, no, we only identified that this was the device --

Q.   Okay.

A.   -- tied to the Apple records, indicating additional -- or the violation of his pretrial release conditions.

Q.   As a result of that, did you then ask questions of Herman Leidel?

A.   Yes.

Q.   Now, to be clear, he was not in custody at that time, right?

A.   That's correct.

AMOS TANG - DIRECT EXAMINATION

Q.   You hadn't told him he was under arrest or anything of that nature?

A.   No, we did not.

Q.   And of course, you didn't advise him of any constitutional or Miranda rights, right?

A.   No.

Q.   And did he tell you why the -- those particular applications -- well, strike that.

First, did he confirm that in fact, those applications had been put on that particular device?

A.   Yes, he did.

Q.   Did he tell you why they were put there?

A.   He -- he stated that the -- the girls from work recommended those applications, and there's -- for one of the apps, he may have also said that he had heard it in like a radio advertisement.

Q.   At any time, did he say, I was curious about the charges and the nature of the evidence against my son, and I wanted to learn about them, so I put them on my phone?

A.   I don't believe so, no.

Q.   And did you ask Herman Leidel about any access that Jason Leidel might have had to his phone and/or any other internet-capable devices in the home?

A.   I did.

Q.   And what was his response?

A.   His response was that -- a mix between there were multiple occasions where he had gone to work and left his phone at the residence; also, there were times where he would write an email or a text message, and he would provide his phone to Jason to proofread for him on his behalf.

MR. CUNNINGHAM:   I have nothing further of Agent Tang, Your Honor.

THE COURT:   Thank you very much.

Is there any cross-examination from the defense? Sorry, I'm losing my voice.

MR. HALL:   Yes, Your Honor.

I'm sorry, Your Honor, about losing your voice.

CROSS-EXAMINATION

BY MR. HALL:

Q.   Agent, you indicated that when you were at the Leidel house in Scranton, that you examined Mr. Herman Leidel's phone; is that correct?

A.   That's correct.

Q.   All right.  And you indicated that in your examination of that phone, you found applications that had been downloaded that were consistent with the type of applications that may have been used in the original charges in this case.

A.   That's incorrect.

Q.   That's what?

A.   That's incorrect.

Q.   Tell me what would be correct, then.

A.   So upon receiving the device, the first thing I did was pull the technical specific details of that device to identify that device.  So for example, I referred to the IMEI of that device.  So that IMEI was a reference point that was consistent with the Apple records that the FBI had received following the court order that was served on Apple, prior to executing the search warrant on the residence.

Q.   Okay.

A.   So by matching the technical information on the device to the Apple records, I was able to see that there was previous electronic records from Apple that was consistent with the download and use of applications that are related or tied to this investigation.

Q.   Okay.  Well, let me just clarify that a little bit so we're --

A.   Sure.

Q.   -- absolutely sure what we're talking about.

So you got records from Apple, correct?

A.   Yes.

Q.   Those records indicated that certain applications had been downloaded from the Apple store --

A.   Correct.

Q.   -- and those applications were consistent with your investigation insofar as the type of applications that had been

used in the initial charges; is that right?

A.    Not only the initial charges but also subsequent to Jason Leidel's release, so like post-January of 2023.

Q.    Okay.  So -- now, in your examination of the phone, though, you're -- you are not able to say specifically that that phone was used for any of the five incidents that are listed in your affidavit; is that correct?

A.    That's -- that's not correct.

      Can you restate your question?

Q.    Yes.

      You have not been able to trace back from Mr. Herman Leidel's phone and specifically say that, any one of those five incidents, that the message came from his phone, can you?

A.    We can.

Q.    You did a Cellebrite report --

A.    That's correct.

Q.    -- or had a Cellebrite report done?

      Does the Cellebrite report reveal that that specific phone was used to send, for example, the January 17th, '23, FOIA request?

A.    So following the seizure of Herman Leidel's cell phone, it was taken back to the FBI, and a forensic exam was done subsequent to that.  There are user change logs that was available on the device that are indicative of downloading

applications tied to the events that we investigated.

Specific to the January 17th eFOIA request, there are user-agent strings that are consistent with the Apple IOS tied to Herman Leidel's Apple account; however, the IMEI, or the specific identifier for that device, is not present.

So with regard to the January 17th eFOIA event, there is circumstantial evidence regarding the device; however, the specific device that was used is not identified in the user change logs specific to Herman Leidel's phone.

Q.   And would that also be true of the other four events in your affidavit, that you cannot -- that you have the same issue as you do with the January 17th?

A.   No, there were a number of other investigative matters that tied Herman Leidel's phone directly to the activity of -- to the investigated activity.

Q.   Well, tell us what they are; what --

A.   So for example, one of the Apple records indicated that the text or the voice over IP texting app, Pinger, or TextFree, was downloaded following Jason Leidel's release.

Additionally, to corroborate that, Sarah Sorg, who is also charged in this investigation, reported and disclosed that she was texted by an unidentified number.  I believe the number began with a 484 number -- I can't recall the exact number that she received a text from, but in essence, the text said something along the lines of, Brian, tell Sarah to call me.  And

she reported that to her -- it was subsequently reported to the FBI.

We investigated that number, and it was tied to a voice over IP.  Additional investigation showed that that voice over IP number was owned by Pinger, so additional records and investigation into Pinger showed that that account was tied to Jason Leidel.

Q.   How?

A.   The registration of that account indicates that the verified phone number tied to that account was Jason Leidel's cell phone number, the 252 number.

Additionally, when we looked at the user activity of that voice over IP texting application, immediately following the message that was sent to Sarah Sorg, that same voice over IP texting application began texting Jason Leidel's cell phone number.

Based on my training, knowledge, and experience, I believe that he was testing that application to ensure that it was functioning properly and that he was texting himself.  This also implies that he would have had a cell phone, specifically the one that's subscribed to him, with his 252 number.

Q.   And at some point in time, didn't Pretrial give him permission to get a cell phone?

A.   Yes.

Q.   And do you know when that was?

A.    I don't recall the exact date.

Q.    Now, Agent, did -- well, let me ask you this.  So it's your testimony that each one of these five incidents, that you can specifically trace these incidents back to Herman Leidel's phone?

A.    That is not what I have said.

Q.    Okay.  And you can't trace any of those incidents back to the PlayStation; is that correct?

A.    That's correct.

        MR. HALL:  Court's indulgence for one moment.

    (Conference between Mr. Hall and Defendant.)

BY MR. HALL:

Q.    Let me ask you a question about the -- you said there was apparently a DuckDuckGo application --

A.    Yes.

Q.    -- that had been downloaded to Herman Leidel's phone?

A.    Yes.

Q.    Okay.  Could you just tell the Court what DuckDuckGo is?

A.    DuckDuckGo is a service, specifically a web browser, that advertises itself to be a browser that doesn't collect user information.  So it allows someone to browse with some degree of anonymity.  Specifically, the provider doesn't collect the user's personal data.

Q.    And were you able to determine, in your examination of Herman Leidel's phone, whether DuckDuckGo was ever utilized?

A.   Yes, not only through the phone but also through Apple records, and also, during our interview of Herman Leidel, he stated that he had downloaded DuckDuckGo following Jason Leidel's release.

Q.   And did he tell you why?

A.   He said he used it to avoid advertisements.

Q.   Okay.

A.   Or for privacy.

Q.   And is that often the reason people use DuckDuckGo?
     You don't know?

A.   Well, I just don't feel comfortable stating that for the general population.  There's lots of legitimate reasons for using DuckDuckGo.

Q.   All right.  And there's a lot of legitimate reasons for using VPNs, right?

A.   Yes.

Q.   And there's a lot of legitimate reasons for using Proton mail?

A.   Yes.

Q.   So your supposition that Mr. Leidel is the source of these five incidents is based on the Apple records; is that correct?

A.   Records from Apple, records from T-Mobile, records from Pinger TextFree.

Q.   And how does T-Mobile fit in here?

A.   Well, the T-Mobile records provide the subscriber

information for that 252 cell phone number, that show that Jason Leidel is the subscriber.  He was the subscriber at the time that that number was used -- was receiving texts from that Pinger account as well, as throughout the course of this investigation.

Q.    Okay.  Now, other than the fact that twice, the Sony PlayStation device is mentioned in your affidavit as having had contact with the internet -- is that correct, there were two occasions?

A.    I would state that upon physical inspection and review of the PlayStation unit, the portable PlayStation gaming device, it was determined that the browser history contained artifacts that it had connected -- either connected to the internet or attempted to connect to the internet based on the web URL that was present within the browser, that also reflected the date and time of attempting to connect to the internet.

Q.    And do you recall what those dates were?

A.    It was -- I believe it was October and November of 2023.

Q.    Okay.

A.    I don't know the exact dates off the top of my head.

Q.    But not January, February, or March, when these alleged events occurred; is that correct?

A.    That's correct.

Q.    Okay.  And when did you say you got the records from Apple concerning Mr. Herman Leidel's device?

A.    I can't recall the exact date.

Q.    Okay.  Was it somewhere between January and -- I assume it was somewhere between January and December of '23?

A.    That's correct.

        MR. HALL:  Nothing further.

        THE COURT:  Thank you very much.

        Counsel, is there any redirect?

        MR. CUNNINGHAM:  Just very briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MR. CUNNINGHAM:

Q.    Agent Tang, Mr. Hall said to you that basically, your supposition that Mr. Leidel was the source -- and I think he was he saying Mr. Herman Leidel.  In fact, it was Mr. Herman Leidel's phone, correct, that you identified as the source of the incidents in your affidavit?

      Do you understand my -- the distinction I'm drawing here?

      Agent Tang, can you answer me?  Do you understand the distinction I'm making?

A.    Right.  I understand your distinction, but my ... I'm just trying to think how to answer this.

Q.    Well, let me put it this way.  Do you know whether it was Jason Leidel or Herman Leidel using the device that the belonged to Herman Leidel?

A.    I do not.

Q.    Okay.  That's what I wanted to clarify.

AMOS TANG - REDIRECT EXAMINATION

But you did find out that Jason Leidel was the subscriber to the telephone number that you identified as having received a message from the Pinger account immediately after it appeared that a message was being sent to Sarah Sorg.

A.   That's correct.

Q.   All right.

MR. CUNNINGHAM:  Nothing further, Your Honor.

THE COURT:  Thank you very much.

Are there any additional questions for this witness?

MR. HALL:  No, Your Honor.

THE COURT:  All right.  Then, Special Agent, thank you so much for your testimony; you may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Does the government wish to call any additional witnesses?

MR. CUNNINGHAM:  No, Your Honor.

THE COURT:  Okay.  Does the defense have any additional witnesses?

MR. HALL:  No, Your Honor.

THE COURT:  All right.  Then I think, perhaps, Counsel, now that the Court has heard all the evidence, we're ready to hear any argument from counsel, and then I'd hope to -- like to get to a ruling at some point today.

MR. CUNNINGHAM:  Judge, I'll be very brief.

THE COURT:  Okay.

MR. CUNNINGHAM:  I would submit to you that consistent with the statement that -- or the affidavit that Agent Tang provided in December of 2023 and the information that they learned as a result of the search and a preliminary analysis, the evidence shows that the kinds of obstructive communications that were received in the wake of Jason Leidel's release in January of 2023 are, one, consistent with the kind of conduct for which he's charged, the underlying conduct specific to -- more specific to E.S.  The consistency of the applications that were used indicate that in fact this obstructive behavior came from the -- from the Leidel residence in Scranton, PA, during the relevant time period.

I would submit to you that the parents were not adequate third-party custodians, that in fact, there are inconsistencies within the presentation.  I mean, you know, Mr. Leidel didn't protest any difficulty with hearing or understanding the questions; it -- you know, in terms of the evasiveness, and I would submit to you that it was evasive, it's an -- indicating -- you know, those specific questions that went to, Where were you in the hospital when you had the first encounter, and you will recall specifically, I was on Madison Street.  Oh, well, wait a minute, that's outside.  And then later, Oh, it was on the 7th floor corridor.

The fact of the matter is, he knew that they were there for his phone, and his phone was supposedly on his desk in

the hospital.  He returns to the home but doesn't take the phone with him; they have to go back to the hospital, bring it back. The claim was that he was incapable of unlocking the device and had his wife do it, and yet, this is a conversation, especially if it's a, you know, somewhat complicated password that is constantly changing, that you would expect, if the agent was listening to the conversation, he would have detected that Mr. Leidel is communicating that password to his wife.

I submit to you that it's more likely that she knew the password and was able to open the phone and provide at least the preliminary access that Agent Tang used to ascertain that the IMEI on that phone matched up with the Apple records that showed the prior access to these applications, that prompted him to ask why.  In that encounter, Mr. Herman Leidel told him, you know, the women at the office told me, or there was an advertisement for it.  He didn't say, listen, I wanted to find out what my son was charged with and why, what's going on here, so I wanted to learn about these applications myself.  That didn't come up in that conversation.

I think that this is a post hoc manufacturing of a more plausible story than what really took place, which was, you know, these things were put on the phone and used by the defendant to engage in the conduct that was in direct contravention of what Judge Xinis' extreme restrictions are and that he should be detained.

THE COURT:  Thank you very much, AUSA Cunningham, for that helpful argument.

Mr. Hall.

MR. HALL:  Thank you, Your Honor.  It's our position that in this case, the government cannot prove, I think in any respect, that those five communications that are at issue came from either Herman Leidel's phone or through the Sony PlayStation.

The PlayStation one, I would suggest to the Court, is largely irrelevant, because the PlayStation appears to have only had some contact with the internet in October or November, it has nothing to do with these five particular incidents, nor, I think, is Agent Tang able to explain to the Court how they have been able to trace those five incidents back to that specific phone, other than the fact that those five incidents employed some of the same software or applications which were used in the original incidents that are the basis of this -- the original charge against Mr. Leidel.

Agent Tang's explanation, I would suggest to the Court, is somewhat convoluted, and he appears to draw himself short of saying that he can absolutely say for certainty by any degree of probable cause or any other standard that that specific device was used.

Insofar as -- the testimony of Mr. Leidel's parents I would suggest shows that they did endeavor to make sure that

Mr. Leidel did not have access to the internet.  First of all, they did have the internet and their Wi-Fi capability terminated by Verizon.  Secondly, they, it appears, are -- while there may be times when Mr. Leidel is in the home by himself, it appears also that usually, one of his two parents was home most of the day.

His mother certainly knew about the Sony PlayStation, and I will proffer to the Court that Mr. Leidel went through his pretrial officer in Scranton to make sure it was okay for him to have a PlayStation.  I don't think a lot of us realize that PlayStations have that sort of internet capability, I'm sure his mother didn't, and I would suggest to the Court, there was no -- no deceit on her part or Mr. Leidel's part insofar as the use of that particular device.

I would also suggest to the Court, as I mentioned in my motion that I filed with the Court, that Mr. Leidel is still a lieutenant commander in the United States Navy.  I'm not sure why the government, in their presentation, seems to fault whatever work he was doing.  I would proffer to the Court that it simply -- if Mr. Cunningham does not appreciate whatever work Mr. Leidel was doing for the Navy, the Navy had no problem with it.  I don't -- I really think that that is not one of the issues that should be taken into consideration.

I would also point out this to the Court.  This alleged behavior happened January 17th, January 21st,

February 22nd, February 22nd again, and then March 24th, yet there was absolutely nothing, no accusation by the government that Mr. Leidel did anything after that period of time as far as accessing the internet.  There's no report of any sort of behavior on his part that caused any distress to either his ex-wife or to the government, yet they don't arrest him until December 7th of 2023.

So he is out in the community under the restrictions that Judge Xinis imposed from January of '23 to December, but through most of that period of time, allegedly, nothing happened, showing the Court that he could be trusted in a pretrial release situation.  And combining that with, I think, the vagueness of Agent Tang's testimony regarding whether they can actually trace these incidents back to that phone or any other device, I suggest to the Court, that testimony was vague and should not be believed.

Mr. Leidel has consistently received high marks from the United States Navy.  He was promoted in 2019 to the rank of lieutenant commander.  He has multiple degrees.  Of course, I understand, Your Honor, this is a very unfortunate set of circumstances that this family has found themselves in, but the question here is whether or not Judge Sullivan was correct in revoking his pretrial release and whether, going forward, he can live on pretrial release.

I would suggest to the Court that his parents did

everything that they could, that there's no direct evidence that Mr. Leidel did anything.  I understand the government's argument is that it's consistent with, but I suggest to the Court that that's not enough for him to have his freedom revoked at this time.

Thank you, Your Honor.

THE COURT:  Thank you very much, Mr. Hall.

Anything further from the government before the Court rules?

MR. CUNNINGHAM:  Just very briefly, Your Honor.

I obviously disagree with that characterization of Agent Tang's testimony respecting the attribution language.  The IMEI is pretty significant.  The Apple records suggested this.

I would also say -- and obviously, we can't speak for Pretrial Services, but I don't believe that there's been any indication that Pretrial Services has been asked to and has essentially revetted the parents as acceptable third-party custodians in this case, because in fact, I think the evidence is very substantial that this conduct occurred.  It came from the phone that was subscribed to and possessed by Herman Leidel and is by all accounts attributable to Jason Leidel.

Thank you, Your Honor.

THE COURT:  Thank you very much.

And before the Court rules, is there anything that Pretrial Services would like to share with the Court?

THE PROBATION OFFICER:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE PROBATION OFFICER:  United States Probation Officer Celine Ferguson, just indicating that we are seeking detention in agreement with the government's position. I'll keep it brief.

THE COURT:  Thank you so much, and thank you for being here today --

THE PROBATION OFFICER:  Thank you, Your Honor.

THE COURT:  -- and the important work that you do.

And Counsel, thank you again for the presentations today as well as the submissions in advance of your presentations to ensure that the Court has a thorough and fulsome record of this matter and can make a de novo determination regarding Mr. Leidel's detention.

I also do want to thank our witnesses who were present and testified today for their testimony.  You can rest assured the Court listened very carefully to each of the testimony provided and will weigh that testimony carefully in connection with my ruling.

I am going to take some time and kind of walk through in a little bit more detail my ruling on the record, since it will be an oral ruling, but I'm going to start by saying a couple things.  Number one, this is a de novo review by the Court; the Court does have the benefit of quite of a bit of a

record prior to today's hearing in this matter, including on these very issues.  And I have reviewed that, but I've come to the hearing with an open mind to hear the evidence and understand the underlying facts that bring us here today.

I must also say that the Court's ruling must be informed by the underlying crime charged in this case, which is stalking of an individual that's been alleged, and that stalking to include harassment, including harassment via use of the internet.  And so that does have to inform how the Court views all of the evidence and all the issues presented in this case in terms of the weight of the evidence and whether or not it meets the standard that the Court must apply in determining whether or not to detain Mr. Leidel.  So I'm going to briefly just walk through the legal standards that the Court applies, and counsel is, of course, familiar with them.

Firstly, under Title 18, United States Code, Section 3145(b), if a person is ordered detained by a magistrate judge, which is what has occurred here, then the Court -- sorry, the person may file with the Court a motion seeking revocation or amendment of that order, and that is what Mr. Leidel has done here in connection with his current detention.  When the Court acts on that motion, the Court reviews the order de novo, and I have done so today in assessing the evidence and legal standards that apply.

Also relevant to our discussion is the Bail Reform

Act, which requires that the Court impose the least restrictive conditions on a defendant to ensure his or her appearance at court, and so there is a strong public interest in not detaining individuals prior to trial when the Court can find conditions, or a combination thereof, to ensure the defendant's continued presence and to protect the public from any dangers.

A person who has been previously released under Section 3142 and who has violated the condition of their release, of course, is subject to revocation of that order of release and to be detained, and the Court shall enter an order of revocation and detention if, after a hearing, it finds that there is probable cause to believe that the person has committed a federal, state, or local crime while on release or whether clear -- that -- clear and convincing evidence that the person violated any of the conditions of his or her release.

If the Court makes such a finding, the Court must also find that there is no condition or combination of conditions that will reasonably ensure that the defendant will appear in future proceedings, and that -- whether or not the defendant poses a danger to the community, and secondly, whether the individual is unlikely to abide by any condition or combination of conditions of release that the Court could impose.

In assessing all of this, the Court, of course, revisits a number of commonly known factors, including the nature and circumstances of the offense charged in the case,

whether it's a crime of violence, the weight of the evidence against the defendant in the case, the defendant's history and characteristics, including his past employment history and past conduct, and of course, the nature and circumstances of any danger posed to an individual or the community by the defendant's conduct.

So all of those factors will weigh into the Court's ruling here.

And I want to start by saying I think the focus here should be a rather narrow one, and I suggested this during the early discussion, in light of the condition imposed by this Court that Mr. Leidel not have access to a computer system or internet-capable device or something similar to that during the period of his pretrial detention.  That condition was imposed in light of the offenses charged in this case and the conduct alleged in this case, and it was a very important factor that the Court considered in ordering his release.  And in fact, the Court did obtain affidavits from his parents, the custodians, to make certain that we would have no concern in this case about Mr. Leidel accessing the internet or engaging in any conduct via the internet.

And so that foundation is very important here, because it emphasizes the importance of why the Court issued that particular condition and why there would be grave concern if the Court was to find that the condition was violated here.

After considering the evidence and testimony, and in particular reviewing the probable cause affidavit before the Court, listening to the testimony of Mr. and Mrs. Leidel and of Special Agent Tang, and again looking at the overall record, I am satisfied that there is clear and convincing evidence before this Court that Mr. Leidel violated the condition prohibiting him from accessing the internet or using an internet-capable device.

My focus is going to be very narrow, and I believe that this evidence is shown during the period January 2023 through March 2023, whereas we discussed today there are a number of alleged communications that are attributed, at least by the government, to Mr. Leidel and/or to, in particular, Mr. Leidel's father's iPhone.

They include the eFOIA request that occurred back on January 17th of 2023; subsequent to that, an email communication to the FBI threat center lodging a complaint; there's also an email spoofing involving E.S., who is one of the victims in this case; an email spoof involving Sarah Sorg; and also an email purported to come from E.S. sent to AUSA Cunningham, which the government alleges and I believe the evidence shows are at least traceable back to Mr. Leidel's, Herman Leidel's iPhone; and there is also strong evidence that that is also associated with Mr. Leidel.

The government has made clear and the Court agrees,

there's no evidence before the Court showing that Mr. Leidel was the one typing in these emails.  We are looking at a circumstantial evidence case, but that doesn't preclude the Court from making its finding.  In particular, I listened very carefully to Special Agent Tang when he explained the forensic analysis done in connection with the apps that were downloaded onto Mr. Herman Leidel's phone, as well as the subsequent analysis of how those apps were accessed, and the interaction between those apps and iPhone known to be associated with Mr. Leidel.

The timing of these communications, in early January, and February, and March of 2023, of course, fits neatly with the time period where Mr. Leidel was first released from custody and commanded to the home of his parents.  It was very early on in that process.  As the defense has noted, it was sometime later before we got to where we are now, but nonetheless, the timing does fit in terms of his being in the home and potentially having the ability to access his father's iPhone.

Mr. Leidel's parents have made very clear that they took steps to disconnect the internet and there was no ability to access the internet from their home, and the Court finds that testimony to be persuasive; however, it is also clear that the internet could have been accessed through other devices, such as either of the parents' iPhones, and we also heard testimony about hotspots, which allow an iPhone to be used to allow other

devices to also access the internet, and there is no dispute based upon the testimony that those capabilities were available through the two cell phones owned by Mr. Herman Leidel and Ms. Charlene Leidel at the time when their son was also residing in the home.

The Court, again, also has to view the evidence, while it is not absolute, in the context, again, of the underlying conduct, and Mr. Leidel's alleged involvement in stalking, and including using the internet to stalk the victim in this case. Mr. Leidel, Sr., Mr. Herman Leidel, testified that he downloaded the apps on his phone in order to get additional information or understanding of the case involving his son, but again, the timing of these downloads really does closely relate in time with the time when Mr. Leidel was first released into his parents' custody. And so the Court weighs that testimony against other evidence in terms of what the Court understands was going on with Mr. Leidel and his case at that time.

In light of these concerns, I am going to conclude that there is clear and convincing evidence that Mr. Jason Leidel used an internet-accessible device I believe on several occasions during the period January 2023 through March of 2023 and used those devices to engage in drafting and sending so-called spoofing emails and many of the items that we've discussed today and are set forth in the affidavit from the FBI.

Given that, I think we have a clear violation of one

of the conditions of Mr. Leidel's release, and it is a condition that was very important to this Court when it was imposed.  And in light of that, the Court would continue to have similar concerns about how we move forward.

The question then becomes for this Court whether, in light of this finding, that there is a combination or any individual condition of Mr. Leidel's release that would ensure that this kind of conduct doesn't happen again, would ensure that he does not pose a danger to any witness in this case, does not pose a danger to any victim associated with this case, does not in any way interfere with the prosecution of this case, and of course also can ensure that he would be present for future proceedings.

And I will note that there are not arguments before the Court that Mr. Leidel would pose a flight risk.  That has never been raised as an issue in this case, so again, the Court is focusing primarily on whether and to what extent he poses a danger, either to the community in general or, in particular, to individuals associated with this case.  And given the underlying charges, I have to say I have a concern about that, a very serious concern about that, and I'm reluctant to think that we can mitigate that concern with a combination of conditions.

During Mr. Leidel's last release, a lot of work was done by the Court and his parents to ensure no internet access, no ability to access the internet, that we would not have to

have a conversation like this.  And I've heard testimony that varies in terms of what exactly happened, but something broke down in that process, and I'm not sure that we can fix that.

I want to give Mr. Hall a chance to be heard as well as the government on whether there's a way to mitigate the concerns that the Court is expressing and, I think, our concerns that have been historically raised in this case in light of the Court's finding that there is clear convincing evidence that Mr. Leidel has used an internet-accessible device on a number of occasions in early 2023.

I'm going to begin -- Mr. Hall, if you want talk about that, I'm happy listen to your thoughts, and then I'll hear from the government.

MR. HALL:  The Court's indulgence for a moment.

THE COURT:  Of course.

Let's give them a little white noise.

Take your time.

THE COURTROOM DEPUTY:  Yes, Your Honor.

(Conference between Mr. Hall and Defendant.)

THE COURT:  Mr. Hall.

MR. HALL:  Yes, Your Honor.  I would suggest to the Court that one way to ensure that there is no violation of the Court's order would be to allow Pretrial -- and he is -- or was -- would be supervised again in Scranton, Pennsylvania -- is to have Pretrial have random access to both of his parents'

cell phones to make sure that there are no further contacts with any of the people or any of the type of VPN or other Proton or one of these other type of services that obscure the origin of the cell phone, and if that is done on a random basis, where they don't know when to expect that sort of inspection to occur, it would, I think, provide the Court with a comfort level that it's not going to happen -- I realize the Court has found that it did happen, so without -- I'm not saying that my client did anything; I'm simply saying that it -- it won't happen again if there is a -- if his parents know that there's going to be that type of random inspection.

He also -- Pretrial did let him have a non-internet-accessible phone, an old-fashioned -- a flip phone; if he has that so he can communicate with the Navy and do his work.  Certainly, if that doesn't -- since Pretrial allowed it, it doesn't provide him with any sort of internet access.

And to the extent that the parents did not know -- and I think a lot of people don't know that something like Sony PlayStation can be used -- in addition to them not having Wi-Fi in the house, we simply could have Pretrial ensure that there is no other type of electronic device such as a PlayStation in the house.

Again, I'm not saying my client did any of these things, but what I am saying is that there are further steps Court could take to make sure that nothing like this happens in

the future.

THE COURT:  Thank you very much, Mr. Hall.

So again, the proposal would be, just before I hear from the government, that Mr. Leidel will return to the custody of his parents --

MR. HALL:  Yes.

THE COURT:  -- with these restrictions already in place, an additional restriction of kind of random searching or checking --

MR. HALL:  Random -- yes.

THE COURT:  -- the cell phone by Pretrial, the parents' cell phones.

MR. HALL:  Yes, yes.

THE COURT:  Okay, all right.  Thank you.

Mr. Cunningham, please go ahead.

MR. CUNNINGHAM:  Your Honor, I -- one, I would begin by emphasizing, of course, that Pretrial Services is not in favor of that, and I would submit to you that that would impose a undue burden on Pretrial Services.

The kind of perhaps assumption or presumption that Mr. Hall wants you to extend to the defendant is probably enjoyed in the initial experience of assessing whether release is appropriate, but Mr. Hall -- excuse me, not Mr. Hall -- Mr. Leidel has proven that the trust imposed -- reposed in him was unwarranted and, essentially, there shouldn't be a second

bite of the apple.

You know, unfortunately, cell phones and internet communication are ubiquitous these days, and the idea that Pretrial Services or whoever, especially somebody in a different district who, essentially, doesn't have the necessary responsibility for the case and isn't responding to the judge who's presiding over the case, is going to be burdened with this task of assessing things, it goes well beyond what the expectations are and the conclusion that there are reasonable, reasonable efforts that can be undertaken to ensure compliance.

Mr. Leidel has forfeited that presumption that might have extended to his benefit, and there aren't reasonable precautions and conditions that can be fashioned to ensure continued compliance.

THE COURT:  Thank you very much, AUSA Cunningham.

I do want to give Pretrial an opportunity to be heard.

THE PROBATION OFFICER:  Yes, Your Honor.  I agree, there is no condition or combination of conditions that the Court could set that would ensure Mr. Leidel's compliance.

As you indicated, he was previously released on some of the most stringent set of conditions possible.  I would also like to note that the Middle District of Pennsylvania, as we know, has been supervising him; it was Officer Jeff Daniel.  I have been in communication with Mr. Daniel, and you know, unlike Special Agent Tang, unfortunately, we are not trained to

identify particular applications or technology to the extent that some others would be.

So unfortunately, not just with this case but with any case where cyber-restrictions are imposed, there is a great deal of trust and somewhat of an honor system that is, you know, given to the defendant to comply with that condition, because as AUSA pointed out, we cannot -- you know, when we conduct these random home visits, you know, we cannot conduct full searches of the home, we cannot assure the Court that there are no devices in the residence; it's just not feasible.

And even so, if the officer were to discover or to search the defendant's parents' cell phones, again, I'm not sure that he would be equipped to identify applications that could hide other things -- you know, we are we're just not trained in that form or fashion.  So I do not believe that that particular condition would mitigate the risk that Your Honor is concerned with.

And again, he was previously released on the most stringent set of conditions, home confinement, 24 hours, no computer access whatsoever, no internet capability whatsoever, and yet these violations occurred.  So it is our belief that being released to the same third-party custodians, to the same home setting, et cetera, would not be an effective way to assure the Court that he would not violate again.

THE COURT:  Thank you so much; that's very helpful.

Anything else from Mr. Hall?

MR. HALL:  No, Your Honor.

THE COURT:  Okay.

Anything further from the government?

MR. CUNNINGHAM:  No, Your Honor.

THE COURT:  All right.  Well, again, thank you for the helpful and thoughtful discussion.  And as the Court suggested in my initial ruling, the policy is always to try to find a way, if we can, to not have to have pretrial detention, but there are circumstances where pretrial detention is necessary, appropriate, and required under the standards that the Court must apply.

We have made, I think, during the history of this case, a very strong effort to address concerns about pretrial detention and to put in conditions and circumstances that would allow Mr. Leidel to remain out of detention but also address the concerns the Court has raised and, also, in light of the underlying case, concerns about access to the internet.

In looking through what we've done over the last couple of years in this case, I don't think that you could find anything else that the Court realistically could do, including the affidavits from the parents, which is something I think that Judge Xinis did, recognizing the need to have special protections about Mr. Leidel's access to the internet.  It's a natural part of how we live today to have cell phones and

internet access, and that is why it is so challenging to restrict, and of course, allowing his parents to continue to have their right to access the internet for their own purposes but protecting the concerns about Mr. Leidel's access, is really the challenge and the balance we've been trying to strike.

I think the bottom line here -- and this was a point that was made by Pretrial -- is that pretrial release ultimately is about trust, and the Court can try to anticipate potential concerns and come up with conditions, working with counsel to try to avoid those concerns, but when there is a breakdown in trust or a breach in trust, we're simply not going to be successful.

In looking at this case and reviewing all that brought us here, which is what the Court talked about at the very beginning of the case, I think there's been a breach of trust, and I am satisfied that there is no condition or combination of conditions that I could impose that would go beyond what the Court has already sought to impose that would guarantee that we are not going to see a repeat of the conduct that's been discussed and found to be here.

So in light of that, I am going to sustain and rule that Mr. Leidel should remain in custody pending trial because of his violation specifically of the condition of his release that required that he not access or use devices that have access to the internet and my finding that he did so on a number of

occasions between the period of January 2023 and March of 2023.

For all the reasons that the Court laid out previously, I am going to revoke his release, and he will remain in the custody of the Marshals until such time as this matter proceeds to trial.

Mr. Hall, if you'd like to be heard.

MR. HALL: Yes, Your Honor.

I was going to suggest to the Court, as the Court may recall, when I originally got in this case, I requested a continuance of the trial date in order to obtain a forensic expert to go through the government's evidence. I expect to hear back from them shortly. In order that we keep this case on track, I was going to suggest to the Court that maybe we should schedule a status conference at some point in the near future so that we can get a trial date and a motions date set in.

THE COURT: The first part of what you said, you mentioned you're going to be procuring a forensic expert?

MR. HALL: Yeah, we have -- we have procured the expert. The expert is working on the drives that the government provided to me that has all of the information that goes into the -- what I'll call the technical part of this case, and I could certainly -- if the Court wants to schedule a status conference, I could certainly check with them on Monday, just to see where they are in the process so that we can, again, as I said, keep this matter on track.

THE COURT:  Okay.  And I will share your desire to get us on track.  I don't think we have a trial date or really a schedule --

MR. HALL:  No.

THE COURT:  -- for all of the steps to get us to trial, happy to set that up.

Let's hear from AUSA Cunningham.

MR. CUNNINGHAM:  Oh, I concur, Your Honor.

THE COURT:  Okay.

So why don't we do this.  I'll have my Chambers reach out to counsel, and we'll come up with some dates.  And we'll set that status conference, and hopefully, we can end up with a schedule to prepare for trial and get us to trial.

And I -- again, I want thank counsel.  I know we were meeting a few weeks ago on this matter; we had to take a little bit of a break.  Thank you for indulging the Court on that; I feel a little bit more comfortable about where we are, having done that work, as our steps go forward.

Mr. Hall, is there anything else you wanted to raise with the Court today?

MR. HALL:  No, Your Honor.

THE COURT:  I'm happy to take under advisement your request to have a status; we'll do that.

MR. HALL:  No, Your Honor.

THE COURT:  Okay.

AUSA Cunningham or AUSA Sullivan.

MR. CUNNINGHAM:  No, Your Honor, thank you.

THE COURT:  Anything else from Pretrial?

THE PROBATION OFFICER:  No, Your Honor, thank you.

THE COURT:  All right.  Well, Counsel, thank you for your time today; we did some important work.  The Court will issue an order consistent with the ruling I made from the bench today with regards to Mr. Leidel's pretrial detention, and also, my Chambers will be in touch shortly so we can schedule that status conference and keep the case moving.

MR. CUNNINGHAM:  Thank you, Your Honor.

THE COURT:  With that, I believe we can stand adjourned.

THE COURTROOM DEPUTY:  Yes, Your Honor.

All rise.  This Honorable Court stands adjourned.

(The proceedings were adjourned at 12:47 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia Klepp, Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of May, 2025.


_____/s/_____
PATRICIA KLEPP, RMR
Official Court Reporter