**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.  22-cr-0380-LKG |
| | * | |
| JASON MICHAEL LEIDEL, | * | |
| | * | |
| Defendant. | * | |
| | ******* | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Court should impose a sixty-month sentence on Jason Michael Leidel—the statutory maximum—because he undertook a years-long and escalating campaign of cyberstalking to ruin the life of first his ex-wife and then her new husband.

**I.      Factual Background**

The Court is, of course, very familiar with the facts proven at trial, which are also detailed in the Presentence Report ("PSR") at paragraphs 4 through 47.  To briefly summarize, in August 2018, after his wife left their marriage, Jason Leidel tried for years to ruin her life and the lives of those around her, using the internet, emails, phones, and other means.

In August 2018, he created an email account (hooknmermaid) which he used to contact Mrs. Swenson's principal, the superintendent of schools, and others in an effort to have them rescind their offer of employment.  During the course of that effort, he made false allegations about Mrs. Swenson's sex life, morality, and her qualifications for employment.  PSR ¶¶ 9-14.  He also used that email account to harass Mrs. Swenson directly with sexually explicit material.  *Id.* ¶ 15.

Mr. Leidel used the same email account in an effort, over the course of several months, to have Mrs. Swenson and their children evicted from their house, again making false claims about her employment and their conduct in the house.  *Id.* ¶¶ 16-20.  That effort included insisting that

Mrs. Swenson take their cat (or he would let it die) and then contacting the property management company knowing that she was not allowed to have the cat.  That resulted in Mrs. Swenson and her daughters having to give up the family cat to an animal shelter.  *Id.* ¶¶ 19-20.

Mr. Leidel also made repeated false reports to Child Protective Services of child neglect and abuse, in an on-going effort to create investigations and damage Mrs. Swenson's ability to care for their children.  *Id.* ¶ 21.

After Mrs. Swenson started dating Mr. Swenson, Mr. Leidel began sending anonymous text messages to Mrs. Swenson, accusing her of being a whore.  *Id.* ¶ 23.

He also reignited his campaign to get Mrs. Swenson removed from her job and to slander her in the community, using fake email accounts made in the names of other people to contact school officials, school board members, members of the press, representatives of the Virginia governor's office, and employees of the school where Mrs. Swenson was seeking a graduate degree.  *Id.* ¶¶ 25-35.  In these emails, he made false claims that Mrs. Swenson had sent sexually-explicit emails, used drugs, used racial epithets and slurs for her special needs children, had abused and neglected her children, and had gotten an abortion.  He also created a fake dating profile for Mrs. Swenson, in an effort to further support these false claims.

Mr. Leidel's efforts also extended to Mr. Swenson, once he started dating Mrs. Swenson.  PSR ¶¶ 39-44.  Mr. Leidel used another email account to email Mr. Swenson's superior officers in the Marine Corps, making more false allegations about his handling of sensitive materials, inappropriate relationships with foreign military officials, and abuse of his own children.  *Id.*

The Court saw these communications at trial.  They were disturbing to say the least.  And although these events happened years before trial, third-party witnesses remembered them because of their explicit nature.

*Victim Impact*

It is difficult to overstate the impact that this conduct had on Mr. and Mrs. Swenson and their children.  Mr. and Mrs. Swenson have submitted victim impact statements, which have been provided to probation, are attached here as Exhibits 1 and 2.  Both plan to be at sentencing to address the court.  It is clear that – for years – Mr. Leidel's conduct was a significant obstacle to their happiness and ability to raise their family.  It has had to be a primary focus of their attention, a constant source of stress and anxiety, and the main fear about their futures.

*Restitution*

There was also significant cost incurred by the Swensons in dealing with the long-term cyberstalking campaign by Mr. Leidel.  A summary of the costs that they have been able to identify is attached as Exhibit 3.  Of course, retribution in this case is mandatory.  *See* 18 U.S.C. § 3663A.

## II.    Sentencing Guidelines Calculation

The Government submits that the appropriate calculation of Mr. Leidel's sentencing guidelines is:

| | |
|---|---|
| Base offense level: | 18 (2A6.2(a)) |
| Pattern of activity: | +2 (2A6.2(b)(1)(E)) |
| Vulnerable victim: | +2 (3A1.1(b)(1)) |
| Obstruction: | +2 (3C1.1) |
| Total offense level: | 24 |

The parties agree that Mr. Leidel's criminal history category is I.  PSR ¶ 64.  As a result, the Government submits that his sentencing guidelines range should be 51-63 months.  The Government will address each of the enhancements briefly.

A.      **Pattern of Activity**

Pursuant to U.S.S.G. § 2A6.2(b)(1)(E), the offense level is increased by 2 levels if the offense involved "a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim." The commentary explains that, "[i]n determining whether subsection (b)(1)(E) applies, the court shall consider, under the totality of the circumstances, any conduct that occurred prior to or during the offense."

Here, the evidence presented at trial and detailed in the presentence report demonstrated that Mr. Leidel repeatedly harassed both Erica Swenson and Michael Swenson over the course of several years as a part of this course of conduct. For example, just in August 2018, Mr. Leidel sent emails to Mrs. Swenson's principal, superintendent, and other school officials on August 14 (two emails), August 20, and August 29. PSR ¶¶ 10-14. These emails repeatedly sought to have the Virginia Beach Schools fire Mrs. Swenson. Just a month later, he sent harassing emails directly to Mrs. Swenson, saying horrible, sexually-explicit things. PSR ¶ 15. He also repeatedly sent emails to the property management company from whom Mrs. Swenson had rented a house, in an effort to have Mrs. Swenson and her daughters evicted from their house. PSR ¶¶ 16, 17, 18, 19. These emails led to investigations by the property management company that put Mrs. Swenson and her daughters in fear of losing their housing. Mr. Leidel also contacted Child Protective Services a number of times falsely claiming abuse or neglect of the children, all allegations that were unfounded but all that led to investigations, stress, and anxiety. PSR ¶ 21.

This pattern of repeated harassment and intimidation continued in 2019, when Mr. Leidel accused Mrs. Swenson of being a whore and then sent anonymous text messages to her making the same claims. PSR ¶ 23-24.

He also again contacted Mrs. Swenson's employer in his on-going effort to get her fired. PSR ¶¶ 25-37. This effort consisted of at least 10 emails sent from fake email accounts and from

his own email account to Mrs. Swenson's principal, the school superintendent, other school officials, government official, and members of the news media, making false claims about Mrs. Swenson being racist, using slurs about her special needs students, abusing her children, using drugs, and having affairs. All of these allegations – again and again – sought to harass and intimidate Mrs. Swenson and have her lose her job.

Ultimately, there can be little doubt that this conduct involved "a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim." U.S.S.G. § 2A6.2(b)(1)(E).

In *United States v. Lloyd*, the Eleventh Circuit held that the district court did not err in applying the two-level enhancement under 2A6.2(b)(1)(E). 809 F. App'x 750, 756 (11th Cir. 2020). There, the Court found the enhancement applied where, "on two separate occasions, Lloyd threatened to ruin his victim's 'good girl reputation' by sharing photos that he had received with her friends and parents, unless he received topless pictures of the victim." *Id.*

Here, Mr. Leidel acted on far more than two occasions and in each instance, went beyond threating to take action – he actually contacted Mrs. Swenson and Mr. Swenson's employers in an effort to get them fired. The 2-level enhancement is appropriate.

### B.      Vulnerable Victim

The Government objects to the PSR's omission of this enhancement because the Swenson's children—who are vulnerable victims—suffered because of Mr. Leidel's conduct. Pursuant to 3A1.1(b)(1), "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." The guidelines commentary makes clear that "'vulnerable victim' means a person … who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. 2.

5

Courts have made clear that the minor children of stalking victims qualify as vulnerable victims for the purposes of this enhancement. For example, in *United States v. Gonzalez*, the Court held that the district court did not abuse its discretion in applying the vulnerable victim enhancement. 905 F.3d 165, 207-08 (3d Cir. 2018). In that case, the defendant had engaged in a years-long stalking campaign of a victim, who was ultimately killed. *Id.* The Court noted that the victim had young children at the time of this stalking and, "[a]s young children, they were 'particularly susceptible or vulnerable to the criminal conduct.'" *Id.* (quoting *Iannone*, 184 F.3d at 220). The court further explained that:

> The defendants certainly knew of the young ages of the children to whom they were related. All of Belford's children were victims of the stalking conduct targeted at their mother. Indeed, some of them testified at trial that they were aware of the stalking campaign — which included false allegations that one of the children had been sexually molested by her mother — and that they were afraid both for their own safety and that of their mother. App. 2654-58. Due to their young age, all of these children were more likely to experience substantial emotional distress as a result of the defendants' conduct; they were powerless to protect themselves from allegations of sexual abuse, and as children, were less able to defend and protect themselves against any attempted harm from the adult defendants. These fears were reasonable in light of the fact that two of the defendants, David and Lenore, previously had kidnapped the children. Accordingly, the District Court did not err in applying of the Vulnerable Victim enhancement.

*United States v. Gonzalez*, 905 F.3d 165, 207-08 (3d Cir. 2018); *see also United States v. Walker*, 665 F.3d 212, 233 (1st Cir. 2011) ("The impaired capacity of a young boy caught in the toils of his parents' deteriorating marriage is readily evident.").

Here, both Mrs. Swenson and Mr. Swenson had minor children who were caught in the middle of Mr. Leidel's on-going stalking campaign. Mrs. Swenson's children (who were also Mr. Leidel's daughters) were living in the house that Mr. Leidel repeatedly sought to have Mrs. Swenson evicted from. In addition, Mr. Leidel repeatedly contacted Child Protective Services, falsely claiming abuse of Mrs. Swenson's daughters. This led to forensic interviews of the children

6

inquiring into personal matters about false allegations of abuse, something no child should have to endure.

Statements provided by both Mr. and Mrs. Swenson highlight the impact that Mr. Leidel's actions had on their children. *See* Exhs. 1 and 2. For example, Mrs. Swenson described crying with her daughters during a call from jail after Mr. Leidel filed false police reports leading to her arrest, which highlights the extreme impact of this, on not just Mrs. Swenson but her daughters. Exh. 1 at 2. Mr. Swenson further explained the impact of this event on the children – "the fear of sudden separation, the confusion of seeing a parent accused of things that never happened, and the lasting anxiety that such a moment leaves behind." Exh. 2 at 2. Mr. Swenson described his step-daughters being subjected to "repeated law-enforcement and child-protective interventions because of false allegations." Exh. 2 at 1.

These are just some of the impacts that Mr. and Mrs. Swenson detail in their statements. And, they should not be surprising – this course of conduct (even when not specifically targeting the children) would necessarily have impacted not just Mr. and Mrs. Swenson but also their children and their ability to build a safe and stable environment for them. It is clear that there were vulnerable victims and the enhancement should apply in this case.

### C. Obstruction of Justice

The PSR properly found that a two-level increase for obstruction of justice should apply, pursuant to 3C1.1. U.S.S.G. § 3C1.1 provides that:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

The guidelines commentary makes clear that conduct qualifies where a defendant is "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." 3C1.1 cmt. 4(B).

For example, the enhancement applies to a defendant suborning perjury by knowingly presenting two alibi witnesses who gave false testimony about defendant's whereabouts. *See United States v. Andrews*, 808 F.3d 964 (4th Cir. 2015); *see also United States v. Jones*, 308 F.3d 425, 429 (4th Cir. 2002) (holding "that when a defendant commits perjury 'to gain an unwarranted release from custody' … an obstruction of justice enhancement is required.").

"The definition of perjury under the Sentencing Guidelines is the same as that which obtains under the substantive federal criminal law. It contains three elements: (1) false testimony (2) concerning a material matter (3) given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory)." *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995) (quoting *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). The Government must prove each of those elements by a preponderance of the evidence for the enhancement to apply. *Id.* Thus, "the district court must 'itself be convinced' that the defendant perjured himself, regardless of whether the jury returned a conviction." *United States v. Montoya-Carmona*, 211 F. App'x 218, 220 (4th Cir. 2007) (quoting *United States v. Smith,* 62 F.3d 641, 646-47 (4th Cir.1995)).

Here, Mr. Leidel took the stand and made a number of materially false statements that could have only been intended to mislead the jury hearing his case. For example:

- He denied having sent any of the emails that formed the primary basis for the cyberstalking claim.
- He denied being familiar with the hooknmermaid email account.

8

- He denied sending any of the emails admitted at trial (Exs. 12, 13, 14) to Principal Yoshida.
- He claimed he did not create the false dating profile admitted at trial (Ex 24).
- He claimed he did not know the michaeljonrs email (Ex 62) and never used it, specifically stating that he had nothing to do with these emails.
- He claimed he did not create the EvanHaney email account.
- He claimed he did not know who sent emails to Mrs. Swenson's property management company.

And this is just a sample of the false statements made during the course of Mr. Leidel's testimony. Any of these statements on their own would qualify for the obstruction of justice enhancement because all go directly to the jury's determination of his guilt of the cyberstalking campaign for which he was charged.

### D.    Zero Point Offender

The PSR applies a two-level reduction in the defendant's offense level, finding he qualifies as a Zero Point Offender, pursuant to U.S.S.G. § 4C1.1.  PSR ¶ 60.  But, that provision requires that "the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim)."  U.S.S.G. § 4C1.1(a)(9).  Here, as discussed above, Mr. Leidel does qualify for a Vulnerable Victim enhancement and, as a result, cannot be a Zero Point Offender.  *See, e.g., United States v. Broyles,* 2024 WL 3836748, *2 (W.D.N.C. Aug. 15, 2024) ("Defendant is ineligible [as Zero Point Offender] because a two-level vulnerable victim increase applied to defendant's total offense level under U.S.S.G. § 3A1.1(b)(1).")).

As a result, Mr. Leidel's adjusted offense level should be 24 and, with a criminal history category of I, his guidelines range should be 51-63 months.

### E.  Violation of Order of Protection

Pursuant to § 2A6.2(b)(1)(A), the offense level is increased by 2 levels if the offense involved "the violation of a court protection order."  While we do not believe that this particular enhancement applies, similar considerations factor into the 3553(a) calculation.

This enhancement serves to increase the penalty where a defendant had committed the crime despite prior efforts to retrain his conduct as to a particular victim.  Here, although there may not have been a formal protective order in place at the time of the conduct proven at trial, there was a similar vehicle – a peace bond – in place at the time.  *See* Peace Bond, attached as Exhibit 6.  There had also been significant litigation during the course of the divorce and custody proceedings, which should have been a further impetus for Mr. Leidel to forego committing these crimes.  Despite that, Mr. Leidel persisted.  The fact that he took these actions at the same time as these proceedings and the peace bond, simply demonstrates his dedication and the need in this case for further deterrence, even if the guidelines enhancement is not applicable.

## III.  Analysis of Factors Under 18 U.S.C. § 3553

### A.  Nature and Circumstances of the Offense

In determining the appropriate sentence, the Court must consider "the nature and circumstances of the offense…."  18 U.S.C. § 3553(a)(1).  Here, the conduct is very serious.  Although we will not reiterate the facts summarized above, and in the PSR, and presented at trial, a few points highlight the severity of the offense.

First, the offense continued over the course of several years.  Although Mr. Leidel receives the same guidelines enhancement as someone who had harassed one victim two times, as was detailed in the PSR and at trial, Mr. Leidel harassed multiple victims time and time again and continued his efforts month after month, and year after year.

Second, the content of these allegations were intensely personal to the victims and often sexually explicit.  He also sent the allegations not just to the victims but to their superiors at work, to the news media, and to other government officials.

Third, the scope of the conduct grew over time – so when initial emails to Principal Yoshida were unsuccessful, he sent them to the Superintendent of Schools.  When those didn't work, Mr. Leidel sent the allegations to school board members and the media in an effort to damage Mrs. Swenson.  And when Mr. Swenson came into the picture, Mr. Leidel sought to ruin his career and life as well.  Moreover, these efforts grew beyond simply jobs to efforts to get them to lose their housing, undermine relationships with family and friends, and create a situation where Mr. and Mrs. Swenson could not be comfortable just living their lives.

Fourth, after he was charged in this case and placed on release at the home of his parents, Mr. Leidel used the same online means he had used to harass and intimidate Mr. and Mrs. Swenson in an effort to target Mrs. Swenson and others, including the FBI agent and prosecutor handling his case.

This Court held a hearing on August 30, 2024 to address Mr. Leidel's violations of pretrial release.  Aug. 30, 2024 Tr. (ECF 174), attached as Exhibit 4.  During the course of that hearing, the Court heard from Mr. Leidel's parents and from FBI Special Agent Amos Tang, who had also submitted an affidavit detailing the investigation.  *See* Tang Aff. (ECF 137-1), attached as Exhibit 5.  As this Court found,

> I believe that this evidence is shown during the period January 2023 through March 2023, whereas we discussed today there are a number of alleged communications that are attributed, at least by the government, to Mr. Leidel and/or to, in particular, Mr. Leidel's father's iPhone.  They include the eFOIA request that occurred back on January 17th of 2023; subsequent to that, an email communication to the FBI threat center lodging a complaint; there's also an email spoofing involving E.S., who is one of the victims in this case; an email spoof involving Sarah Sorg; and also an email purported to come from E.S. sent to AUSA Cunningham, which the government alleges and I believe the evidence

shows are at least traceable back to Mr. Leidel's, Herman Leidel's iPhone; and there is also strong evidence that that is also associated with Mr. Leidel.

Exh. 4 at 98.  The Court continued:

I am going to conclude that there is clear and convincing evidence that Mr. Jason Leidel used an internet-accessible device I believe on several occasions during the period January 2023 through March of 2023 and used those devices to engage in drafting and sending so-called spoofing emails and many of the items that we've discussed today and are set forth in the affidavit from the FBI.

Exh. 4 at 100.

### B.    Seriousness of the Offense

The Court must also consider the "need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  Here, the offense was quite serious.  In addition to the aspects of the offense discussed above, we know how serious it was because it was successful (at least for some time) in ruining the lives of Erica and Mike Swenson, and significantly impacting the lives of their children.  *See* Exhs. 1 and 2, Victim Impact Statements.

### C.    Deterrence and the Need to Protect the Public

The Court must also consider "the need for the sentence imposed … to afford adequate deterrence to criminal conduct [and] to protect the public from further crimes of the defendant…."  18 U.S.C. § 3553(a)(2)(B), (C).  Here, there is a significant need for deterrence, both specifically as to Mr. Leidel and as to general deterrence.

Mr. Leidel's dedication to his criminal activity was clear.  He committed his crimes over the course of years, using various means to harass and intimidate his victims.  He used the internet to mask his identity while committing his crimes and nearly succeeded.  He took the identities of others in an effort to further hide his identity.  And, he accessed the online accounts of Erica Swenson in his effort to do so.  He also continued his online stalking activity after he was charged

in this case, as demonstrated by his conduct towards the investigator and prosecutor on this case. Moreover, he has done nothing to accept responsibility for his crimes. His victims continue to live in fear that this conduct will start again as soon as he is released from custody. As a result of all this, there is a significant need to deter him from further criminal activity.

But, there is also a need for general deterrence. As we interact with each other more and more through digital means, the ability of criminals to use those online tools to harass and intimidate anyone who wrongs them increases. It is important that potential future cyberstalkers receive the message that this conduct will not be tolerated.

### D.    History and Characteristics of the Defendant

The Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Here, the Defendant does not have any criminal history. PSR ¶¶ 63-64. As detailed in the PSR, he has had a solid education and a lengthy career in the Air Force and the Navy. The Defendant did not have a financial need that drove his criminal activity. In short, the Defendant had all the opportunities we want individuals in society to have and, despite that, he chose to undertake this stalking scheme over the course of several years. His ample opportunity to choose a different path suggests that a significant sentence is appropriate.

**IV.    Recommendation**

For all these reasons, the Government submits that a sentence of 60 months incarceration is the appropriate sentence in this case and is sufficient but not greater than necessary to reflect the seriousness of the offense, provide adequate deterrence, and protect the public.

Respectfully submitted,

Kelly O. Hayes
United States Attorney


By:____/s/_____
Kenneth Clark
Christopher Sarma
Assistant United States Attorneys

14

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of February 2026, a copy of the foregoing Government's Sentencing Memorandum was served electronically through the Clerk of the United States District Court using CM/ECF and email, to:

Marc Hall, Esquire
Counsel for Defendant


_____/s/_____
Kenneth S. Clark